NO. 07-00-0144-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

AUGUST 7, 2001

_____

JOHN BRADFORD CROW, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 232ND DISTRICT COURT OF HARRIS COUNTY;

NO. 735352; HONORABLE LARRY FULLER, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

Following his plea of not guilty, appellant John Bradford Crow was convicted of murder and sentenced by a jury to 16 years confinement and assessed a $10,000 fine.[1] Presenting eight issues, he challenges his conviction because (1) the trial court erred and

---

[1]A mistrial was granted upon the first trial because the jury was unable to reach a verdict. The offense of deadly conduct was submitted in the charge during the second trial but it was not submitted in the charge at the first trial.

abused its discretion in failing to order the State to disclose grand jury testimony, (2) the State failed to disclose exculpatory impeachment evidence in violation of the United States Constitution, (3) the trial court erred in admitting the indirect hearsay testimony from Diana Lilly, (4) the trial court erred in admitting the indirect hearsay testimony from Deborah Bierman, (5) the trial court erred in admitting evidence of extraneous offenses for which the State failed to provide notice, (6) the evidence is legally insufficient, (7) the evidence is factually insufficient, and (8) the trial court erred in refusing to admit the original draft of appellant's statement. Based on the rationale expressed herein, we reverse and remand to the trial court for a new trial.

On Sunday, February 25, 1996, Teri Nelson died from a gunshot wound to the head. Appellant claims that after he told the deceased that they would be "breaking up," she became angry and threatened to commit suicide. After several unsuccessful attempts to take appellant's gun, a .41 Magnum Smith and Wesson revolver, she attempted to strike him with a clothes iron. As he raised his hands to ward off her blow, the gun fired. Appellant was kicked, scratched, and clawed by the deceased during this altercation and claims the gun accidently fired as a result of his attempt to protect himself.

At the time of the incident, the deceased was living with her mother. On Saturday night, while the deceased was at appellant's townhouse watching television with him, appellant's roommate, Officer Villarreal, and his girlfriend, Anissa Broesche, arrived and noticed tension between them. However, the tension seemed to ease when both couples

2

retired to their bedrooms. Appellant had agreed to let the deceased spend the night and drive her home the next morning.

Villarreal testified that appellant and the deceased often bickered. When he awoke Sunday morning, Villarreal heard appellant and the deceased arguing. According to Villarreal, he heard the deceased ask for the phone and about 20 to 30 minutes later, he heard one shot, which he first believed was a shoe thrown against the wall. His girlfriend testified that before she heard the shot, she heard the deceased say, "please, Brad, please." However, Villarreal did not remember hearing those words. After the shot, appellant asked Villarreal for assistance and he called 911 while appellant paced the hallway. When officers arrived at the scene, they found the deceased laying in a puddle of blood with a bullet hole through her head. Appellant told Officer Rogge that the deceased tried to hit him with an iron and the gun went off when he raised his arms to block the thrust. Officer Rogge told him not to make anymore statements until he was informed of his rights.

Considering appellant's issues in a logical order rather than sequential order, we first consider appellant's sixth issue by which he contends the evidence is legally insufficient to support his conviction. We disagree. In conducting a legal sufficiency review, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61

3

L.Ed. 2d 560 (1979); Geesa v. State, 820 S.W.2d 154, 161 (Tex.Cr.App. 1991), *overruled on other grounds*, Paulsen v. State, 28 S.W.3d 570, 573 (Tex.Cr.App. 2000). All the evidence is considered in the light most favorable to the jury's verdict. Johnson v. State, 871 S.W.2d 183, 186 (Tex.Cr.App. 1993); Chambers v. State, 805 S.W.2d 459, 460 (Tex.Cr.App. 1991). In reviewing the sufficiency of the evidence, all the evidence must be considered, regardless of whether properly or improperly admitted. Miles v. State, 918 S.W.2d 511, 512 (Tex.Cr.App. 1996). The same standard applies to review of both direct and circumstantial evidence cases. Houston v. State, 663 S.W.2d 455, 456 (Tex.Cr.App. 1984). If a challenge to the legal sufficiency of the evidence is sustained, appellant is entitled to acquittal. Tibbs v. Florida, 457 U.S. 31, 41, 102 S. Ct. 2211, 72 L.Ed.2d 652 (1982); Cain v. State, 976 S.W.2d 228, 233 (Tex.App.--San Antonio 1998, no pet.).

Before determining whether the evidence is legally sufficient to sustain the conviction, we must review the elements the State was required to prove. In order to be guilty of murder, the State was required to prove that appellant intentionally or knowingly caused the death of the deceased, or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of the deceased. Tex. Pen. Code Ann. § 19.02(b)(1) and (2) (Vernon 1994). Section 6.03 of the Penal Code defines the culpable mental states of "intentionally" and "knowingly" as follows:

> (a) A person acts intentionally . . . with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly . . . with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Murder, intentionally or knowingly committed, is a result oriented offense. Cook v. State, 884 S.W.23d 485, 490 (Tex.Cr.App. 1994). The accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result. *Id.* Specific intent to kill may be inferred from the use of a deadly weapon. Garcia v. State, 887 S.W.2d 862, 869 (Tex.Cr.App. 1994). Further, in establishing intent or knowledge and when faced with a record that supports conflicting inferences, we must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. Couchman v. State, 3 S.W.3d 155, 163 (Tex.App.–Fort Worth 1999, pet. ref'd), citing Matson v. State, 819 S.W.2d 839, 846 (Tex.Cr.App. 1992).

Assistant medical examiner, Vladimir M. Parungao, M.D., testified that the deceased died from a gunshot wound to the head at close range. The wound was to the right temporal area and exited horizontally from the point of entrance to the left side and slightly to the back. The evidence also established that the bullet entered the wall at four feet, ten inches, making a horizontal flight, finally lodging in the closet of the adjoining bedroom. The deceased was a little over five foot, five inches tall, while appellant was approximately five foot, ten inches.

Appellant's brother, Stephen Crow, testified that he and appellant had been raised with knowledge and use of weapons from a very young age. Robert Baldwin, a firearm's expert, examined appellant's .41 Magnum Smith and Wesson revolver and explained that "Magnum" is a higher pressure and larger cartridge weapon. He explained that a single-action discharge requires drawing the hammer back and pulling the trigger, whereas a double-action discharge only requires applying pressure to the trigger. Appellant's gun had been altered to be lighter than the minimum factory specifications in both single-action and double-action modes of operation. Baldwin also testified about the types of safety devices that are incorporated into appellant's firearm and how those devices would prevent the gun from discharging. Further, he testified that someone familiar with gun safety would know that cocking a firearm and placing your finger on the trigger are steps taken in preparation for discharge.

According to the testimony of Villarreal and his girlfriend, Broesche, appellant and the deceased argued before they went to bed and again on Sunday morning, and there appeared to be a confrontation regarding use of the telephone. Broesche testified that she heard the deceased plead with appellant before she heard the fatal shot.

As described in his four page written statement,[2] and introduced as State's exhibit 43, appellant contended he and the deceased had been arguing and she had threatened to commit suicide using his gun. After several unsuccessful attempts to grab the gun from

---

[2]A copy of appellant's statement is attached as appendix "A."

6

him, the deceased threatened to kill him and picked up the iron in an attempt to swing it at him. He acknowledged picking his gun up from the bed and holding it waist level pointing downward. According to appellant, the hammer was not cocked. As the deceased swung the iron at his face, he "jerked" his arms up in front of his face to protect himself and the gun fired.

By his witnesses and evidence, appellant attempted to show that the deceased had a history of violence and that they constantly fought and argued. A forensic homicide reconstructionist testified that after examining the evidence, the deceased's wound, and the blood spatter, he determined that the deceased was turning and could have been swinging an object when she was shot.

Based on the foregoing evidence, we must defer to the jury's resolution in favor of the prosecution that appellant was aware that his conduct was reasonably certain to cause death. We also conclude that reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. Appellant's sixth issue is overruled.

Agreeing with appellant's third and fourth issues that the trial court reversibly erred by admitting indirect or "backdoor" hearsay testimony, we need not conduct a factual sufficiency review. Appellant complains of the testimony of Diana Lilly and Deborah Bierman. Lilly knew the deceased because Lilly's daughter and the deceased were friends and the deceased worked for Lilly at a video store. Bierman, a friend and co-worker of

7

Lilly's, was also acquainted with the deceased.  By artful questioning, the State elicited testimony from Lilly and Bierman about prior incidents where the deceased had a black eye and busted lip.  The testimony was reported as follows:

Diana Lilly (R.R. vol. 4, 191-196).

* * *

Q I want to talk with you about an occasion about five months before then.  Do you know which occasion I am speaking of?
A Yes, ma'am.
Q Where were you?
A At my home.
Q Who else was there?
A My daughter Lacey and my friend and roommate at the time, Deborah Bierman
Q Did anybody come over?
A Teri came to visit.
Q How was Teri acting that day that she came to visit?
(objection by Mr. Schneider)

* * *

Q Ms. Lilly, you understand you are not to testify to this jury in any way about anything Teri ever told you?
A Right.
Q You understand that?
A Yes, ma'am.
Q And my question to you was, how was Teri acting that day when she came over?
A Combination, she was kind of hyper.  She was kind of hyper, bubbly, but yet on this occasion she seemed worried.  I guess that would be the best way to describe her.
Q Did you notice or see anything unusual as far as her appearance that day?

8

A     Yes. I questioned her because of a busted lip at that time.

Q     At that time five months prior to the date of her death, where was Teri – who was Teri dating?

A     Brad Crow.

Q     Where was Teri living at that time?

A     I'm not certain of the time she lived with him and then did not live with him, but I believe at that time she was in fact living with him.

Q     When you saw the busted lip on Teri - - listen to my question - - what did you say to her?

A     I told her she needed to talk to her mother.

Q     Why did you say that?

A     Because I am a mother and I have a daughter the same age as her and considering that Brad's mother knew what was going on, I felt it only fair that her mother should know what was going on.

Q     This is a yes or no question. Did you ask Teri how she got the busted lip?

A     Yes, I did.

Q     Did you go into anymore detailed conversation that day with Teri about your concerns for her?

A     No. I asked my friend Debbie to intercede.

*   *   *

Q     Did you make any comments or give any advice to Teri yourself regarding her relationship with the defendant?

A     That she was too good for him and she needed to know that and she needed to walk away and she needed to walk away fast.

*   *   *

Q     Was there ever any other occasion that you noticed anything about Teri's appearance besides this day of the busted lip?

A     A few weeks prior to hearing of her death, Teri was in and out of my house all the time. She was welcome anytime, and it was quite often that I would come home and find her there, whether it would be to use a phone or go out to eat with my youngest daughter, those types

9

of things. And I had come in and noticed what appeared to me to be a black eye.

Q  And the time that you saw the black eye was when compared to the date she was killed?

A  Probably about three weeks, four weeks before.

Q  At that time who was Teri was dating?

A  Brad Crow.

Q  Do you know where she was living at that time?

A  I believe she was back with her mom at that time.

Q  Again you can't say anything Teri told you, but did you ask her how she got the black eye?

A  Yes, I did.

Q  Did she answer you, yes or no?

A  Yes, she did.

Q  After she answered you, did you make any advice, give any advice or make any comment to her?

A  I believe I threatened her, that if I saw something again, that I would call her mother myself. I believe it was at that point.

Q  Did you say anything to Teri in regards to what she should do with the relationship between Teri and the Defendant?

A  Just basically that, in my opinion, that's not a relationship. And that's the only advice I could give her: "That's not a relationship. You need to get away from him."

* * *

Deborah Bierman (R.R. vol. 4, 205 - 208)

* * *

Q  Approximately how many years before her death did you know her [Teri]?

A  Two years.

Q  You understand that you are not allowed to testify to anything that Teri told you today to this jury?

A  Yes, ma'am.

Q  Was there an occasion prior to her death where you noticed something unusual about Teri's appearance?

A  Yes.

10

Mr. Schneider:      Your honor, I renew the objection.

The Court:      Yes. Overruled.

Q     First of all, when? From when Teri died February 25th of '96, how much before then did this occasion happen?

A     About three months.

Q     Where were you all?

A     We were over at Diana's house.

Q     Who all was home?

A     Diana, her daughter Lacey, myself and Teri.

Q     What was it specifically you saw as far as Teri's appearance that you noticed?

A     A black eye.

Q     What kind of black eye?

A     A very distinctive, noticeable black eye.

Q     Did you say anything to Teri in regards to the black eye?

A     Yes, ma'am. I asked her how she got it.

The Court:   You are not to repeat anything Teri said. You understand that?

The witness: Uh-huh.

Q     This is a yes or no question. Did Teri answer you?

A     Yes.

Q     After she answered you, did you say anything? Did you say anything back to her?

A     Yes.

Q     What did you say?

The Court:   What you said.

A     Okay. I told her that this was a relationship she needed to walk away from.

Q     And when you said "relationship," you meant relationship between whom?

A     Herself and Brad.

\* \* \*

Q     Again, just limiting yourself to what came out of your mouth, what did you tell Teri as far as advice this day you saw the black eye?

\* \* \*

11

Q      Okay. What advice did you give Teri? What advice did you give Teri after you saw the black eye and she told you how she got it?

A      I told her that this was not a healthy relationship and it was one she needed to walk away from.

Q      Did you go into anymore detailed explanation, did you, about abusive relationships?

A      I lived in one for seven years and I told her it does not get better. It gets worse.

Appellant contends that although Lilly and Bierman did not testify that the deceased told them that appellant caused her black eye or busted lip, the examination was crafted and structured in effect to compel the members of the jury to conclude that the deceased told the two witnesses that appellant caused her black eye and busted lip. Accordingly, appellant contends that the admission of the testimony violated the hearsay rule. Tex. R. Evid. 801. In response, the State contends that the admission of the evidence was not an abuse of discretion and the trial court's ruling should be sustained if it was correct on any theory of law applicable to the case.

Conceding that an out-of-court statement need not be directly quoted in order to offend the hearsay rule, Head v. State, 4 S.W.3d 258, 261 (Tex.Cr.App. 1999) and Schaffer v. State, 777 S.W.2d 111, 114 (Tex.Cr.App. 1989), the State contends that the prosecutor was merely being cautious to ensure that she did not elicit any hearsay testimony, but that the witnesses confine their remarks to their own observations and beliefs. However, in *Schaffer*, the Court held:

12

. . . where there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly. In short, "statement" as defined in Tex. R. Civ. Evid. 801(a) (now see Tex. R. Crim. Evid. 801(a)) necessarily includes *proof* of the statement whether the proof is direct or indirect.

*Id.* During a bench conference after the State called Lilly but before she was sworn, the trial judge declined to excuse the jury; however, counsel for appellant did present his concerns about presentation of "back door" hearsay through the testimony of Lilly. Specifically, appellant's counsel argued that the State could not do "by implication what she can't do directly." In response to the prosecutor's request to let her ask the question, appellant's counsel then responded: "No, because it's in front of the jury and if she asks the questions in front of the jury, you throw the skunk in the jury box." After further discussion, the court concluded the bench conference by advising appellant's counsel that he could take his objection up and proceeded to swear the witness.

The testimony presented by Lilly and Bierman discussing when they questioned the deceased about a black eye or a busted lip effectively communicated to the jury two out-of-court statements by the deceased to the witnesses that appellant caused her black eye and busted lip. The State's examination was carefully crafted similar to a rhetorical question to suggest the obvious answer, to wit: yes, the deceased told the witnesses that appellant caused her black eye or busted lip.

13

Next, we consider whether the evidence was offered to prove statements made outside the courtroom. During the bench conference, before the testimony was presented, the State's attorney said that the State did not intend to violate the hearsay rule; however, we are inclined to view the examination to the contrary for several reasons. First, if the State considered the black eye and busted lip important, it would have asked similar questions to other witnesses. It is significant to note that the State did not ask the deceased's mother, or other good friends who were called by the State after Lilly and Bierman, about the black eye or busted lip. Next, Sergeant Johnston had already testified that when appellant was photographed at the police station, he had scratches on his neck, back, and arm, which would corroborate appellant's statement of a struggle initiated by the deceased. Moreover, this being the second trial, the State had the opportunity to expect evidence by the defense that the deceased often cursed, abused and struck appellant, and even fought and struck her own mother, thus prompting the State to respond with some evidence that appellant was an abusive person or the aggressor in the relationship. Accordingly, the State did indirectly that which it could not do directly.

Although the State contended in the trial court that it did not intend to introduce hearsay statements by the deceased, the State urges for the first time on appeal that her statements to Lilly and Bierman could have been hearsay admissible to reveal her state of mind under Rule 803(3) of the Texas Rules of Evidence. However, a statement by the deceased to the two witnesses that appellant caused her black eye or busted lip is not evidence of the state of mind of the deceased. *See* Dorsey v. State, 24 S.W.3d 921, 928-

14

29 (Tex.App.--Beaumont 2000, no pet).[3] *See also* Barnum v. State, 7 S.W.3d 782, 789 (Tex.App.--Amarillo 1999, pet. ref'd) (holding that the trial court reversibly erred in admitting a writing signed by the deceased which, among other things, stated that the deceased believed that Barnum was planning on murdering her to collect the proceeds of her life insurance). In addition, even if the statements are evidence of her state of mind five months or weeks before the tragic weekend, they do not demonstrate her state of mind on the weekend of her death. Moreover, although the court's charge instructed the jury that it could consider relevant facts and circumstances going to show the condition of the mind of appellant at the time of the offense, it did not make a similar instruction regarding the condition of the mind of the deceased and the State did not request such an instruction. Accordingly, as in *Dorsey* and *Barnum,* we conclude the trial court abused its discretion in admitting the out-of-court statements by the deceased. *Schaffer*, 777 S.W.2d at 114.

Having held that the "indirect" hearsay statements were erroneously admitted, we must now determine whether the error affected appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex.Cr.App. 1997). Although appellant's roommate and his girlfriend heard the shot, and

---

[3]In *Dorsey*, the court held that (1) statements by the deceased that if anything happened to her, it "meant that Dorsey had killed her . . .," and (2) statements by the deceased that Dorsey had once held her down on the bed with a knife to her throat, etc. were not reflective of the victim's state of mind but simply recounts her memory of events.

excluding the statement of appellant, there were no eye witnesses to the tragic event and the evidence was almost entirely circumstantial. Considerable evidence from several sources, including the mother of the deceased, demonstrated that the deceased suffered from depression, severe rage reactions and runaway behavior. A psychologist testified that the rage disorder of the deceased was so deeply rooted that it would cause her to use violence to control a person trying to leave a relationship or another person that threatens a relationship. Her mother even acknowledged that on numerous occasions, the deceased would shout and curse her and physically struggle with her. State witness Jennifer Mitchell, a close friend of the deceased who talked with the deceased by telephone about 2:00 a.m. on Sunday morning, testified that on occasions when the deceased exploded and cussed appellant, he would be calm and gentle with the deceased and did nothing inappropriate.

Photographs of appellant, taken at the police station, showed scratches on his neck, back and arm, and an old bruise on his arm. The iron was on the floor and the cord was extended under a pile of clothing. Although we held that the evidence was legally sufficient to support the verdict, the evidence cannot be described as overwhelming. At the bench conference the State argued, and by its brief argues, that it did not want to inject hearsay statements of the deceased, but only wanted to show what the witness observed, to-wit, the black eye and busted lip. However, this position is not consistent with the fact that the State did not ask the mother of the deceased, other State witnesses, and close friends of

16

the deceased, or even appellant's roommate and his girlfriend, if they saw the deceased with a black eye or busted lip.

In *Dorsey*, the Court concluded that:

> The State relied upon the hearsay statements of co-workers and friends to weave a story of abuse and fear. Critical in the plot were the hearsay statements described herein. Not only was the inadmissible hearsay evidence extremely prejudicial, given the State's theory of the case, it also tended to negate the defensive theory offered by appellant and to cause the jury to convict on the basis of inadmissible evidence.

24 S.W.3d at 930. Similarly, the State's circumstantial evidence was enhanced by the inadmissible hearsay statements of the deceased that appellant caused her black eye and busted lip, indicating to the jury that appellant, not the deceased, was the aggressor in the relationship. Concluding that the erroneously admitted evidence had a substantial and injurious effect on the verdict of murder, issues three and four are sustained.

Our sustention of issues three and four requires that the judgment be reversed and the cause remanded. Thus, consideration of appellant's remaining issues is pretermitted. Tex. R. App. P. 47.1. Accordingly, the judgment of the trial court is reversed and the cause remanded for a new trial.

Don H. Reavis
Justice

Do not publish.

17