Charles Ray DORSEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–98–501 CR.

Court of Appeals of Texas, Beaumont.

Submitted Dec. 9, 1999.

Decided Sept. 6, 2000.

Jimmy Parks, San Antonio, for appellant.

Michael A. McDougal, Dist. Atty., Gail Kikawa McConnell, Asst. Dist. Atty., Conroe, for State.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

EARL L. STOVER, Justice.

A jury convicted appellant Charles Ray Dorsey of murder[1] of his wife, Pamela Dorsey, and sentenced him to life imprisonment in the Texas Department of Criminal Justice—Institutional Division. Dor-

---

1. Pursuant to TEX. PEN.CODE ANN. § 19.02(b)(1) (Vernon 1994), a person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

sey appeals his conviction with twenty-three points of error.[2]

In point of error twenty-one, Dorsey contends the evidence was legally and factually insufficient to support his conviction. Specifically, he argues that because there was no eyewitness to the murder, no evidence of blood spatter on his person or clothes, and no "hair, fiber, or fingerprint evidence that in any way indicated he was the perpetrator," the evidence was insufficient to show he murdered Pamela Dorsey.

Set forth below is the standard by which an appellate court reviews legal and factual sufficiency points; it is the same for both direct and circumstantial evidence. *See Geesa v. State,* 820 S.W.2d 154, 158 (Tex.Crim.App.1991).

In evaluating legal sufficiency, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. . . .

[A]ll evidence admitted at trial—including improperly admitted evidence—is considered in a legal sufficiency review. *Dewberry v. State,* 4 S.W.3d 735, 740–41 (Tex.Crim.App.1999), cert. denied, — U.S. ——, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000).

. . . .

In determining whether the evidence is factually sufficient to support the conviction, we must view all of the evidence, without the prism of "in the light most favorable to the prosecution," and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996).

*Wilson v. State,* 7 S.W.3d 136, 141 (Tex. Crim.App.1999). In our sufficiency review, we are governed by the fact that the jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given to the testimony. Tex.Code Crim. Proc. Ann. Art. 38.04 (Vernon 1979). The jury may believe or disbelieve all or any part of a witness's testimony, even though the witness's testimony has been contradicted. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986). Reconciliation of conflicts in the evidence is within the exclusive providence of the jury. *Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996). Where, as here, identity is an issue in the case, the identity of the perpetrator may be proved by direct or circumstantial evidence. *See Earls v. State,* 707 S.W.2d 82, 85 (Tex. Crim.App.1986).

## BACKGROUND

Early in the morning on May 14, 1996, Charles Dorsey called 911 and reported that his wife Pamela Dorsey had been shot. He told the operator that "it's my little boy. He got in her purse and got her gun." Delane Potter, a patrol security officer for the subdivision in which the Dorseys lived, responded to the emergency call. In the bedroom of the house, the security officer found Pamela Dorsey "lying [face down] in the bed, covered up to about to the neck." Potter indicated that Dorsey was very upset, and two and one half year old Connor appeared confused and disoriented. Potter did not notice any blood on either Dorsey, the child, or the carpet. Neither did he see much blood on the bed sheets. He did observe, however, "what seemed like about two drops of blood that came out of her nose and onto her wrist." Potter testified that in the six and one half years he had worked at the

---

**2.** *Three different judges presided at different stages of the case.* Prior to declaring a mistrial in the case, the Honorable Ross Sears presided over appellant's motion to suppress and motion to change venue; the Honorable Charles Hearne later presided over appellant's reurging of his motion to change venue and the jury selection process; and the Honorable A.D. Azios presided at trial.

subdivision, he had never been to the Dorsey home on a disturbance call.

James Reed, the EMT on the scene, described the emergency procedures performed on Pamela that night. He also testified he observed "some blood" coming from her nose and a small amount of blood on the pillow and on both sides of her head. Reed was not aware of any blood in other parts of the room or on the sheet that covered her. According to Reed, none of the procedures performed on Pamela Dorsey by emergency personnel that night would have caused bruising or injury to her head, skull, or facial area.

Also called to the home in the early morning hours of May 14, 1996, was Peggy Frankhauser, head of the automated fingerprint system for the Montgomery County Sheriff's Department. She testified a revolver and a holster were found on the floor by the night stand and the bed. At the base of the triple dresser in the bedroom was Pamela Dorsey's purse with the contents dumped out beside it.

Dr. Vladimir Parangao, assistant medical examiner of Harris County, testified regarding the autopsy report. He indicated the cause of Pamela's death was a gunshot wound to the back of the head.

An examination of the body revealed a small abrasion around the right eye, along with some discoloration around the eye that made it appear "like a black eye." The abrasion to the right eye area could not have been caused by the gunshot. The hemorrhage in the muscle around the left temple was the result of a blunt trauma and not of a gunshot wound. Dr. Parangao testified "[s]omething hit this part of the head, whether it was hit by something blunt, or the head hit something blunt." The examination also revealed a "light blue-purple contusion on the left side of the neck that extend[ed] up to the left shoulder." In Dr. Parangao's opinion, there was some type of trauma to the neck that could have been consistent with choking. In addition, there were petechiae, thin hair-sized hemorrhages in the whites of Pamela's eyes, that were caused by asphyxia from choking, strangulation, ligature, or smothering. Parangao testified the injuries associated with choking were distinguishable from those caused by the tracheotomy performed on Pamela Dorsey during the emergency medical treatment on May 14. Also present were "abrasions of the upper chest" that were consistent with the administration of CPR by the emergency personnel.

On cross-examination, Dr. Parangao acknowledged he did not know what procedures, other than CPR, the medical personnel performed on Pamela Dorsey in an attempt to save her life. He acknowledged the possibility that emergency personnel could have handled her body in such a way as to cause some of the injuries noted in the autopsy. On further examination by the State, however, Dr. Parangao testified the presence of the petechiae is not consistent with a body being mishandled, because petechiae only occur before the person's death—while alive or in the process of dying.

Ivan Wilson, who works for the Department of Public Safety Crime Lab in Austin, performed a gunshot residue analysis on the clothing of Dorsey and Connor and on the hands of Dorsey, Pamela, and Connor. He detected no residue on Dorsey's or Connor's clothing.

In explaining the gunshot residue test performed on a person's hands, Wilson testified that the analyst looks for the presence of three elements—antimony, barium, and lead. If all three elements are present, the test is positive; if all three elements are not present, the test is negative. However, in the case of most .22 caliber ammunition, he indicated no antimony is present, only barium and lead. Wilson did not know what kind of ammunition was used in the murder weapon, a .22 revolver.

Wilson classified each of the three gunshot residue tests on the hands as negative. However, he did indicate the test on

Connor's hands detected the presence of two of the elements, barium and lead, but not antimony. According to Wilson, Connor's test was classified negative, because all three elements were not present.

In explaining the possible meanings of a negative test, Wilson testified that several possibilities exist:

(a) The person did not fire the weapon himself or did not handle it after it was fired.

(b) A person wearing gloves fired the weapon, or a person without gloves fired the weapon and then removed the residue by wiping or washing his hands.

(c) The weapon was not a type that deposits residue.

(d) The .22 caliber ammunition used in the gun was the type that did not contain antimony.

(e) The same weapon may have deposited residue in one shot and not in another.

Even with a positive residue test, Wilson indicated it is still possible that the person did not fire the gun, but instead handled it after it was fired by someone else.

David Tanner, firearms examiner with the Montgomery County Sheriff's Department, testified regarding trigger pull pressure and gun safety. In double action mode (hammer forward), the gun had a trigger pull pressure of eleven pounds, while in single action mode (hammer cocked), the pressure was four pounds. Commenting on gun safety, Tanner testified the safest way to carry a revolver is in the double action mode. Similarly, Detective Tidwell, a firearms examiner for the Montgomery County Sheriff's Department, stated he had never seen or known anyone who carried a revolver cocked.

Also admitted into evidence was a video tape of Connor Dorsey that the State made some fourteen days after the murder. One purpose of the tape was to conduct an experiment to determine whether the child was capable of pulling the trigger on the gun. The tape shows that Connor had the physical capability of pulling the trigger of the gun when the hammer was cocked; however, when the gun's hammer was not cocked, he was unable to pull it. The videotape also reveals that Connor had difficulty holding up the gun and could not open the holster when it was snapped shut.

Various witnesses testified concerning conversations with Pamela in which she told them she feared for her safety. Her boss, Linda Reynolds, testified Pamela had informed her that she was in an abusive relationship and was afraid to leave Dorsey. Specifically, Pamela told her that Dorsey on one occasion "held a gun to her head ... actually put a gun into her mouth and threatened her and that she was indeed afraid for her life." In late April 1996, Pamela asked Linda Reynolds for the name of a good divorce attorney. According to Reynolds, Pamela stated that Dorsey had threatened to take the little boy away. At a seminar on May 13, 1996, the day before the murder, Pamela told Reynolds that she had informed Dorsey the night before that she would be leaving him. She also indicated to Reynolds she was apprehensive about going home that night, because she was afraid Dorsey might have run off with Connor.

Sherry Scarborough, another co-worker, testified Pamela had told her in mid-April that Dorsey was physically abusive toward her. Pamela described for Sherry how Dorsey had once grabbed her by the throat and left marks on her neck. Sherry also indicated Pamela told her that Dorsey had previously held a gun to her head and under her throat and threatened to kill her.

Other witnesses testified for the State. Amy Patane, the Dorseys' neighbor, who had a child about the same age as Connor Dorsey, testified she never saw Connor play with guns or indicate any interest in guns. David Davis, a friend of Dorsey's, testified he had seen bruises on Pamela's

neck and was also aware of a bloody fight that occurred between Dorsey and Pamela at Davis's house some six years earlier. According to Davis, Pamela at one point broke Dorsey's nose.

■■■ Dorsey is correct in asserting that, by itself, mere presence at the scene of the crime is not sufficient to support a conviction for murder. *See Thomas v. State*, 645 S.W.2d 798, 800 (Tex.Crim.App. 1983). It is, however, a circumstance tending to prove guilt which, combined with other facts, may suffice to show that the accused was a participant, or, as in this case, the perpetrator. *Id.* Here, the evidence shows much more than Dorsey's mere presence at the scene of the crime. Evidence from various witnesses reveals the history of the abusive relationship described above. Although Dorsey claimed the young child shot his mother, the videotape revealed the child could not get the gun from the holster and could not shoot it in the uncocked position. Another witness described a bloody fight between Dorsey and Pamela and testified Dorsey told him he would kill Pamela if she ever left with the child. The autopsy report reveals the presence of bruising on the neck, around the right eye and left temple, as well as the presence of petechiae in the whites of the eye, indicating choking, strangulation, or ligature.

Because a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt, there is legally sufficient evidence to support the verdict. After reviewing all of the evidence, we cannot say that the jury's verdict of guilt is so against the overwhelming weight of the evidence as to be manifestly unjust. The evidence is factually sufficient as well. Point of error twenty-one is overruled.

In our sufficiency review, we have, as required, considered all the evidence, even improperly admitted evidence, keeping in mind the binding legal concept that mere presence alone at the scene of the crime is insufficient to establish guilt. We now turn to consider evidence that was erroneously admitted at trial and the substantial and injurious effect that this improperly admitted evidence had upon the jury verdict.

■■■ In point of error twelve, Dorsey contends the "trial court erred in allowing inadmissible hearsay statements of the deceased victim" into evidence. In his brief on appeal, he characterizes the statements Pamela made to co-workers and friends as follows: "she had been seeking a divorce"; "she and appellant had not been getting along"; "appellant had been abusive towards her"; "she was afraid to divorce appellant"; "she thought appellant had followed her on some occasions"; "appellant had threatened to kill her"; "appellant had once held a knife to her throat" and; "she believed that if anything strange happened to her, like a weird car accident, it meant Dorsey had killed her."

■■■ Under each of the listed categories, appellant refers us to certain pages in the record which contain specific hearsay statements objected to at trial. Included within those references, three of which are listed above, are the following: Pamela's statement that Dorsey held her down on the bed with a knife to her throat; her statement that Dorsey held a gun to her head, up under her throat, and in her mouth; her statement that if anything ever happened to her, it meant that Dorsey had killed her; and her statement that Dorsey followed her every day to work to make certain she was there.[3]

---

**3.** On cross examination, trial counsel attempted to mitigate the damaging testimony elicited by the State during direct examination regarding the gun to the mouth, head, and throat. In so doing, he opened the door to more details regarding the incidents. However, appellant does not waive the harmful effect of improperly admitted evidence when he seeks to meet, destroy, or explain it. *See Edwards v. State*, 813 S.W.2d 572, 576 (Tex. App.-Dallas 1991, pet. ref'd).

The trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard on appeal. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App.1994). A reviewing court should not reverse a trial judge whose ruling was within the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 101 (Tex.Crim.App.1996) (quoting *Montgomery v. State*, 810 S.W.2d 372, 379–80, 391 (Tex.Crim.App.1990)).

Dorsey objected to the admission of the testimony on hearsay grounds. The State claimed the evidence was admissible under TEX.R. EVID. 803(3), the "state of mind" exception to the hearsay rule, quoted below:

### (3) Then Existing Mental, Emotional, or Physical Condition

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The statements that appellant places at issue in point of error twelve contain portions that are admissible under Rule 803(3) exception and portions that are not.[4] "Statements of intent by the declarant [Pamela Dorsey] to prove *future conduct* are generally admissible when the future conduct is relevant to some aspect of the case." *Wilks v. State*, 983 S.W.2d 863, 865 (Tex.App.-Corpus Christi 1998, no pet.); *see also Vann v. State*, 853 S.W.2d 243, 250 (Tex.App.-Corpus Christi 1993,

pet. ref'd) (Victim's statement that he was not happy in his marriage and wanted to find a way out was admissible as a statement of his emotional state and intent to act.) Reynold's testimony that Pamela said she was thinking of leaving Dorsey and wanted the name of a divorce attorney is admissible under Rule 803(3), since it shows her future intent to leave Dorsey. Likewise, the hearsay testimony describing Pamela's fear of Dorsey is admissible under Rule 803(3) to show her emotional state or "mental feeling" at the time she made the statement. *Id.*

We reach a different conclusion, however, regarding the testimony recounting Pamela's statement that if anything strange happened to her, like a car crash, it meant that Dorsey had killed her. Because the out-of-court statement represents a belief held by Pamela, we conclude it does not fall under the exception in Rule 803(3). *See Vann*, 853 S.W.2d at 250 (Deceased's statement that he "wouldn't be surprised if Cherie was waiting for me at home with a gun and shot me" was not admissible under Rule 803(3), because it went beyond his state of mind and entered the realm of his belief.); *see also Barnum v. State*, 7 S.W.3d 782 (Tex.App.-Amarillo 1999, no pet. h.) (Deceased's statement that she believed her husband might be planning to murder her for life insurance proceeds was a statement of belief and not admissible under Rule 803(3)).

Likewise, inadmissible are Pamela's out-of-court statements that Dorsey had once held her down on the bed with a knife to her throat, that he held a gun to

---

4. We acknowledge the existence of cases holding that "hearsay statements of the deceased are not admissible in a prosecution for murder of a wife." *See Jones v. State*, 515 S.W.2d 126, 128 (Tex.Crim.App.1974) (citing as examples of this rule's application several cases holding that the contents of divorce petitions filed by the deceased, annulment petitions filed by the deceased, and the contents of temporary restraining orders against the defendant sought by the deceased are

inadmissible hearsay). "Such a blanket exclusion of statements made by the deceased spouse encourages automatic exclusion of this evidence without analysis of whether the statements may nevertheless be admissible pursuant to an exception to the hearsay rule." *Williams v. State*, 927 S.W.2d 752, 760 (Tex. App.-El Paso 1996, pet. ref'd). We do not adhere to a blanket exclusion rule, but instead analyze the statements pursuant to the rules of evidence.

her head and throat and had put a gun into her mouth, and that he followed her every day to work to make certain she was there. Such statements are not reflective of her state of mind or a belief, but simply recount her memory of events. *See Navarro v. State,* 863 S.W.2d 191 (Tex.App.-Austin 1993), *pet. ref'd,* 891 S.W.2d 648 (Tex.Crim.App.1994). (Deceased's statements to her mother that appellant put a gun to her head and threatened to kill her are statements of memory to prove the fact remembered and not admissible under Rule 803(3)); *Buhl v. State,* 960 S.W.2d 927, 932 (Tex.App.-Waco 1998, pet. ref'd) (Trial court was correct in excluding testimony by a witness, that defendant had said he was afraid of victim because victim pulled guns on him, since relevance of victim's out-of-court statement hinged on truthfulness of his assertion that victim had, in fact, pulled guns on him.).

The statements herein were not reflective of Pamela's state of mind but instead were her memories of specific events. They were not admissible under Rule 803(3). Quoting Justice Cardozo, the Court of Appeals pointed out in *Gibbs v. State,* 819 S.W.2d 821, 837 (Tex.Crim.App. 1991), cert. denied 502 U.S. 1107, 112 S.Ct. 1205, 117 L.Ed.2d 444 (1992) that if the distinction between state of mind and a statement of "memory or belief to prove the fact remembered or believed" is ignored, "there would be an end, or nearly that, to the rule against hearsay."

The State refers us to our holding in *Williams v. State,* 798 S.W.2d 368 (Tex. App.-Beaumont 1990, no pet.). There, this Court found a witness's testimony regarding the victim's out-of-court statements to be admissible under the state of mind exception to the hearsay rule. We find the *Williams* case distinguishable from the instant case. In *Williams,* the victim testified as the State's last witness. Prior to her testimony, the State called as a witness the deputy who had been dispatched to the hospital to speak with the victim shortly after she reported the sexual assault to the authorities. The deputy testified that during the interview at the hospital the victim was crying, shaking, and scared, and she kept telling the deputy that he (the defendant) was going to kill her. The deputy further indicated the victim was very disturbed. We characterized the officer's testimony as a description of the victim's emotional state and found it admissible under Rule 803(3).

In the instant case, the testimony of the three witnesses regarding the statements mentioned above does not reflect a description of Pamela's emotional state. Instead, the statements are simply a description of three specific incidents —— Dorsey's holding Pamela down on the bed with a knife to her throat, his holding a gun to her head, throat, and mouth, and his following her to work every day —— and, in the other instance, a specific belief —— that if she died in some unusual way, Dorsey would have been the one who killed her.

■■■ It is true that evidence from other witnesses indicating domestic violence in the Dorsey home came in otherwise. It is also well established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *See Anderson v. State,* 717 S.W.2d 622, 628 (Tex.Crim.App.1986); *Couchman v. State,* 3 S.W.3d 155, 160–61 (Tex.App.-Fort Worth 1999, pet. ref'd). However, that evidence is not the same or even substantially similar to this evidence. The holding of a knife to Pamela's throat and a gun to her head, mouth, and throat is of a different character altogether. We, therefore, conclude the trial court abused its discretion in admitting the hearsay testimony, because the statements do not fall within the exception to Rule 803(3), and the same or similar evidence did not come in otherwise. As a result, the trial court's decision to admit the evidence was not within the zone of reasonable disagreement. We must, therefore, determine

whether, under TEX.R.APP. 44.2(b), the error is harmful.

▮▮▮▮▮ Under Rule 44.2(b), we disregard the error if it does not affect Dorsey's substantial rights. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *See King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). We review the record as a whole to determine whether the error had such an influence on the jury's verdict. *Mosley,* 983 S.W.2d at 259.

The record in this case reveals a 911 call in which Dorsey reported his wife had been accidently shot by their son. The record also contains evidence of domestic violence between Pamela and Dorsey, as well as testimony regarding Pamela's fear of Dorsey, her intent to seek out a divorce lawyer, and Dorsey's threat to kill her. The autopsy report reveals Pamela had unexplained bruises, as well as petechiae in her eyes, which Dr. Parangao testified raised a red flag in his mind. None of this evidence, however, has the specificity and directness, at least in terms of inculpating appellant, as does the inadmissible hearsay evidence described herein. Graphic evidence of specific abusive incidents was extremely prejudicial and damaging in view of the fact that the cause of Pamela's death was a gunshot wound to the back of the head. Clearly, Pamela's memories of specific abusive incidents, similar to the type of abuse that resulted in her death, along with her belief that Dorsey would be responsible for her death, would have a telling effect upon the jury.

We note the evidence in this case was entirely circumstantial; there were no eyewitnesses that testified at trial. The defense proffered by Dorsey was that he did not do it; there was no claim that he accidentally shot Pamela or that he shot her in self-defense. While the evidence of Dorsey's guilt may have been compelling, it was not overwhelming. The State relied upon the hearsay statements of co-workers and friends to weave a story of abuse and fear. Critical in the plot were the hearsay statements described herein. Not only was the inadmissible hearsay evidence extremely prejudicial, given the State's theory of the case, it also tended to negate the defensive theory offered by appellant and to cause the jury to convict on the basis of inadmissible evidence.

We have grave doubts about the effect of the erroneously admitted evidence and find its admission had a substantial and injurious effect on the verdict. Point of error twelve is sustained, and the case is remanded to the trial court for a new trial. We need not address the remaining points of error, because sustaining any one of them would not afford any greater relief.

We reverse the judgment and remand the case for a new trial.

REVERSED AND REMANDED.

RONALD L. WALKER, Chief Justice, concurring.

The admissibility or inadmissibility of hearsay evidence began many years ago as a plague upon human understanding, presently having evolved into endless circumambulation to the point that one's battery goes dead from honking at one's own tail-lights.

The proffered and admitted evidence in the instant case consisted of statements allegedly made by the decedent, Pamela Dorsey, to friends and co-workers. These statements are set out in the majority's opinion. The majority does an excellent job addressing each of the hearsay statements elicited by the State or necessarily injected by appellant's counsel in mitigation. Under present case law, I believe it safe to say that sometimes a decedent may speak from the grave and sometimes they must remain forever silent even to the point of freeing their killer. As the majority sets out, the decedent Pamela Dorsey may speak posthumously that she feared

appellant and was contemplating divorce. However, when it comes to Pamela's statement regarding those acts that created her fear, (appellant putting a gun to her head, threatening to kill her, placing a knife to her throat, etc.), we are compelled to conclude that under Tex.R. Evid. 803(3), Pamela should not speak, for indeed such hearsay is only a recounting of events to prove the fact remembered, i.e., Pamela's fear of appellant.

My concurrence is for the purpose of pointing out the irony, and perhaps the injustice of 803(3), as applied to the present case.

Ironically, under 803(3), were the present case one involving the question of whether appellant unduly influenced Pamela in the execution of her will, the hearsay statements of decedent that she executed same because appellant held a knife to her throat and a gun to her head, would be admissible under 803(3). Not so however, in a case where appellant is charged with the execution of Pamela, to wit: killing her with a gun.

The rule needs revisiting in situations where a party is charged with the death of declarant.