NO. 07-08-0491-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 29, 2009
______________________________

IN RE MEGAN LEE DOZIER, 

                                                                                                 Relator
_______________________________

Dissent
_______________________________


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.
          I respectfully dissent from the majority opinion and would deny the application for
writ of mandamus. 
          Dozier and Brian Barkley, a married couple who had a child together, were divorced
via a lawsuit filed in Potter County. Dozier and the child allegedly had been living in Cottle
County since the filing of the divorce petition. After doing so, she eventually filed a motion
requesting the Potter County Court to modify aspects of the divorce and custody decree. 
So too did she move to transfer venue of the matter to Cottle County since she and the
child purportedly had lived in that county for at least six months prior to initiation of the
proceeding. The trial court convened an evidentiary hearing to consider the transfer
request and ultimately denied it. Dozier believed this to be an abuse of discretion given
the terms of the applicable venue statute.


 
          Underlying the trial court’s determination is the question of whether or not Dozier
and the child had resided in Cottle County for the requisite period of time before seeking
transfer. Though Dozier testified that they did, other evidence illustrated that the Cottle
County house she supposedly lived in was vacant, that she periodically stayed with her
boyfriend in a neighboring county, and that she told Barkley that she had a new address
in Randall County. Thus, the trial court was obligated to consider the credibility of the
parties, weigh the evidence and decide if the child had indeed lived in Cottle County for the
last six months. And, because it did, I would deny mandamus because an appellate court
may not grant such relief when resolution of a fact issue underlies the trial court’s decision. 
Mendoza v. Eighth Court of Appeals, 917 S.W.2d 787, 789 (Tex. 1996) (prohibiting an
appellate court from disturbing a trial court’s factual determinations via an original
mandamus proceeding); Brady v. Fourteenth Court of Appeals, 795 S.W.2d 712, 714 (Tex.
1990) (recognizing that an appellate court may not deal with disputed issues of fact via a
mandamus proceeding).
 
                                                                           Brian Quinn                                                                                                  Chief Justice



nt's gun had
been altered to be lighter than the minimum factory specifications in both single-action and
double-action modes of operation. Baldwin also testified about the types of safety devices
that are incorporated into appellant's firearm and how those devices would prevent the gun
from discharging. Further, he testified that someone familiar with gun safety would know
that cocking a firearm and placing your finger on the trigger are steps taken in preparation
for discharge.

 According to the testimony of Villarreal and his girlfriend, Broesche, appellant and
the deceased argued before they went to bed and again on Sunday morning, and there
appeared to be a confrontation regarding use of the telephone. Broesche testified that she
heard the deceased plead with appellant before she heard the fatal shot. 

 As described in his four page written statement, (2) and introduced as State's exhibit
43, appellant contended he and the deceased had been arguing and she had threatened
to commit suicide using his gun. After several unsuccessful attempts to grab the gun from
him, the deceased threatened to kill him and picked up the iron in an attempt to swing it
at him. He acknowledged picking his gun up from the bed and holding it waist level
pointing downward. According to appellant, the hammer was not cocked. As the
deceased swung the iron at his face, he "jerked" his arms up in front of his face to protect
himself and the gun fired. 

 By his witnesses and evidence, appellant attempted to show that the deceased had
a history of violence and that they constantly fought and argued. A forensic homicide
reconstructionist testified that after examining the evidence, the deceased's wound, and
the blood spatter, he determined that the deceased was turning and could have been
swinging an object when she was shot.

 Based on the foregoing evidence, we must defer to the jury's resolution in favor of
the prosecution that appellant was aware that his conduct was reasonably certain to cause
death. We also conclude that reviewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential elements of murder
beyond a reasonable doubt. Appellant's sixth issue is overruled. 

 Agreeing with appellant's third and fourth issues that the trial court reversibly erred
by admitting indirect or "backdoor" hearsay testimony, we need not conduct a factual
sufficiency review. Appellant complains of the testimony of Diana Lilly and Deborah
Bierman. Lilly knew the deceased because Lilly's daughter and the deceased were friends
and the deceased worked for Lilly at a video store. Bierman, a friend and co-worker of
Lilly's, was also acquainted with the deceased. By artful questioning, the State elicited
testimony from Lilly and Bierman about prior incidents where the deceased had a black eye
and busted lip. The testimony was reported as follows:

 Diana Lilly (R.R. vol. 4, 191-196).


* * * Q I want to talk with you about an occasion about five
months before then. Do you know which occasion I am
speaking of?

 A Yes, ma'am.

 Q Where were you?

 A At my home.

 Q Who else was there?

 A My daughter Lacey and my friend and roommate at the
time, Deborah Bierman

 Q Did anybody come over?

 A Teri came to visit.

 Q How was Teri acting that day that she came to visit?

 (objection by Mr. Schneider)


* * *


 Q Ms. Lilly, you understand you are not to testify to this
jury in any way about anything Teri ever told you?

 A Right.

 Q You understand that?

 A Yes, ma'am.

 Q And my question to you was, how was Teri acting that
day when she came over?

 A Combination, she was kind of hyper. She was kind of
hyper, bubbly, but yet on this occasion she seemed
worried. I guess that would be the best way to describe
her.

 Q Did you notice or see anything unusual as far as her
appearance that day?

 A Yes. I questioned her because of a busted lip at that
time.

 Q At that time five months prior to the date of her death,
where was Teri - who was Teri dating?

 A Brad Crow.

 Q Where was Teri living at that time?

 A I'm not certain of the time she lived with him and then
did not live with him, but I believe at that time she was
in fact living with him.

 Q When you saw the busted lip on Teri - - listen to my
question - - what did you say to her?

 A I told her she needed to talk to her mother.

 Q Why did you say that?

 A Because I am a mother and I have a daughter the same
age as her and considering that Brad's mother knew
what was going on, I felt it only fair that her mother
should know what was going on.

 Q This is a yes or no question. Did you ask Teri how she
got the busted lip?

 A Yes, I did.

 Q Did you go into anymore detailed conversation that day
with Teri about your concerns for her?

 A No. I asked my friend Debbie to intercede.


* * *


 Q Did you make any comments or give any advice to Teri
yourself regarding her relationship with the defendant?

 A That she was too good for him and she needed to know
that and she needed to walk away and she needed to
walk away fast.


* * *


 Q Was there ever any other occasion that you noticed
anything about Teri's appearance besides this day of
the busted lip?

 A A few weeks prior to hearing of her death, Teri was in
and out of my house all the time. She was welcome
anytime, and it was quite often that I would come home
and find her there, whether it would be to use a phone
or go out to eat with my youngest daughter, those types
of things. And I had come in and noticed what
appeared to me to be a black eye. 

 Q And the time that you saw the black eye was when
compared to the date she was killed?

 A Probably about three weeks, four weeks before.

 Q At that time who was Teri was dating?

 A Brad Crow.

 Q Do you know where she was living at that time?

 A I believe she was back with her mom at that time.

 Q Again you can't say anything Teri told you, but did you
ask her how she got the black eye?

 A Yes, I did.

 Q Did she answer you, yes or no?

 A Yes, she did.

 Q After she answered you, did you make any advice, give
any advice or make any comment to her?

 A I believe I threatened her, that if I saw something again,
that I would call her mother myself. I believe it was at
that point.

 Q Did you say anything to Teri in regards to what she
should do with the relationship between Teri and the
Defendant?

 A Just basically that, in my opinion, that's not a
relationship. And that's the only advice I could give her:
"That's not a relationship. You need to get away from
him."


* * *


 Deborah Bierman (R.R. vol. 4, 205 - 208)


* * *


 Q Approximately how many years before her death did
you know her [Teri]?

 A Two years.

 Q You understand that you are not allowed to testify to
anything that Teri told you today to this jury?

 A Yes, ma'am.

 Q Was there an occasion prior to her death where you
noticed something unusual about Teri's appearance?

 A Yes.

 Mr. Schneider: Your honor, I renew the objection.

 The Court: Yes. Overruled.

 Q First of all, when? From when Teri died February 25th
of '96, how much before then did this occasion happen?

 A About three months.

 Q Where were you all?

 A We were over at Diana's house.

 Q Who all was home?

 A Diana, her daughter Lacey, myself and Teri.

 Q What was it specifically you saw as far as Teri's
appearance that you noticed?

 A A black eye.

 Q What kind of black eye?

 A A very distinctive, noticeable black eye.

 Q Did you say anything to Teri in regards to the black
eye?

 A Yes, ma'am. I asked her how she got it.

 The Court: You are not to repeat anything Teri said. 
You understand that?

 The witness: Uh-huh. 

 Q This is a yes or no question. Did Teri answer you?

 A Yes.

 Q After she answered you, did you say anything? Did you
say anything back to her?

 A Yes.

 Q What did you say?

 The Court: What you said.

 A Okay. I told her that this was a relationship she needed
to walk away from.

 Q And when you said "relationship," you meant
relationship between whom?

 A Herself and Brad.


* * *


 Q Again, just limiting yourself to what came out of your
mouth, what did you tell Teri as far as advice this day
you saw the black eye?


* * *


 Q Okay. What advice did you give Teri? What advice did
you give Teri after you saw the black eye and she told
you how she got it? 

 A I told her that this was not a healthy relationship and it
was one she needed to walk away from.

 Q Did you go into anymore detailed explanation, did you,
about abusive relationships?

 A I lived in one for seven years and I told her it does not
get better. It gets worse.


Appellant contends that although Lilly and Bierman did not testify that the deceased told
them that appellant caused her black eye or busted lip, the examination was crafted and
structured in effect to compel the members of the jury to conclude that the deceased told
the two witnesses that appellant caused her black eye and busted lip. Accordingly,
appellant contends that the admission of the testimony violated the hearsay rule. Tex. R.
Evid. 801. In response, the State contends that the admission of the evidence was not an
abuse of discretion and the trial court's ruling should be sustained if it was correct on any
theory of law applicable to the case. 

 Conceding that an out-of-court statement need not be directly quoted in order to
offend the hearsay rule, Head v. State, 4 S.W.3d 258, 261 (Tex.Cr.App. 1999) and
Schaffer v. State, 777 S.W.2d 111, 114 (Tex.Cr.App. 1989), the State contends that the
prosecutor was merely being cautious to ensure that she did not elicit any hearsay
testimony, but that the witnesses confine their remarks to their own observations and
beliefs. However, in Schaffer, the Court held:

 . . . where there is an inescapable conclusion that a piece of evidence is
being offered to prove statements made outside the courtroom, a party may
not circumvent the hearsay prohibition through artful questioning designed
to elicit hearsay indirectly. In short, "statement" as defined in Tex. R. Civ.
Evid. 801(a) (now see Tex. R. Crim. Evid. 801(a)) necessarily includes proof
of the statement whether the proof is direct or indirect.


 Id. During a bench conference after the State called Lilly but before she was sworn, the
trial judge declined to excuse the jury; however, counsel for appellant did present his
concerns about presentation of "back door" hearsay through the testimony of Lilly. 
Specifically, appellant's counsel argued that the State could not do "by implication what she
can't do directly." In response to the prosecutor's request to let her ask the question,
appellant's counsel then responded: "No, because it's in front of the jury and if she asks
the questions in front of the jury, you throw the skunk in the jury box." After further
discussion, the court concluded the bench conference by advising appellant's counsel that
he could take his objection up and proceeded to swear the witness.

 The testimony presented by Lilly and Bierman discussing when they questioned the
deceased about a black eye or a busted lip effectively communicated to the jury two out-
of-court statements by the deceased to the witnesses that appellant caused her black eye
and busted lip. The State's examination was carefully crafted similar to a rhetorical
question to suggest the obvious answer, to wit: yes, the deceased told the witnesses that
appellant caused her black eye or busted lip.

 Next, we consider whether the evidence was offered to prove statements made
outside the courtroom. During the bench conference, before the testimony was presented,
the State's attorney said that the State did not intend to violate the hearsay rule; however,
we are inclined to view the examination to the contrary for several reasons. First, if the
State considered the black eye and busted lip important, it would have asked similar
questions to other witnesses. It is significant to note that the State did not ask the
deceased's mother, or other good friends who were called by the State after Lilly and
Bierman, about the black eye or busted lip. Next, Sergeant Johnston had already testified
that when appellant was photographed at the police station, he had scratches on his neck,
back, and arm, which would corroborate appellant's statement of a struggle initiated by the
deceased. Moreover, this being the second trial, the State had the opportunity to expect 
evidence by the defense that the deceased often cursed, abused and struck appellant, and
even fought and struck her own mother, thus prompting the State to respond with some
evidence that appellant was an abusive person or the aggressor in the relationship. 
Accordingly, the State did indirectly that which it could not do directly.

 Although the State contended in the trial court that it did not intend to introduce
hearsay statements by the deceased, the State urges for the first time on appeal that her
statements to Lilly and Bierman could have been hearsay admissible to reveal her state
of mind under Rule 803(3) of the Texas Rules of Evidence. However, a statement by the
deceased to the two witnesses that appellant caused her black eye or busted lip is not
evidence of the state of mind of the deceased. See Dorsey v. State, 24 S.W.3d 921, 928-29 (Tex.App.--Beaumont 2000, no pet). (3) See also Barnum v. State, 7 S.W.3d 782, 789
(Tex.App.--Amarillo 1999, pet. ref'd) (holding that the trial court reversibly erred in admitting
a writing signed by the deceased which, among other things, stated that the deceased
believed that Barnum was planning on murdering her to collect the proceeds of her life
insurance). In addition, even if the statements are evidence of her state of mind five
months or weeks before the tragic weekend, they do not demonstrate her state of mind on
the weekend of her death. Moreover, although the court's charge instructed the jury that
it could consider relevant facts and circumstances going to show the condition of the mind
of appellant at the time of the offense, it did not make a similar instruction regarding the
condition of the mind of the deceased and the State did not request such an instruction. 
Accordingly, as in Dorsey and Barnum, we conclude the trial court abused its discretion in
admitting the out-of-court statements by the deceased. Schaffer, 777 S.W.2d at 114.

 Having held that the "indirect" hearsay statements were erroneously admitted, we
must now determine whether the error affected appellant's substantial rights. Tex. R. App.
P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect
or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266, 271
(Tex.Cr.App. 1997). Although appellant's roommate and his girlfriend heard the shot, and
excluding the statement of appellant, there were no eye witnesses to the tragic event and
the evidence was almost entirely circumstantial. Considerable evidence from several
sources, including the mother of the deceased, demonstrated that the deceased suffered
from depression, severe rage reactions and runaway behavior. A psychologist testified
that the rage disorder of the deceased was so deeply rooted that it would cause her to use
violence to control a person trying to leave a relationship or another person that threatens
a relationship. Her mother even acknowledged that on numerous occasions, the deceased
would shout and curse her and physically struggle with her. State witness Jennifer
Mitchell, a close friend of the deceased who talked with the deceased by telephone about
2:00 a.m. on Sunday morning, testified that on occasions when the deceased exploded
and cussed appellant, he would be calm and gentle with the deceased and did nothing
inappropriate. 

 Photographs of appellant, taken at the police station, showed scratches on his neck,
back and arm, and an old bruise on his arm. The iron was on the floor and the cord was
extended under a pile of clothing. Although we held that the evidence was legally sufficient
to support the verdict, the evidence cannot be described as overwhelming. At the bench
conference the State argued, and by its brief argues, that it did not want to inject hearsay
statements of the deceased, but only wanted to show what the witness observed, to-wit,
the black eye and busted lip. However, this position is not consistent with the fact that the
State did not ask the mother of the deceased, other State witnesses, and close friends of
the deceased, or even appellant's roommate and his girlfriend, if they saw the deceased
with a black eye or busted lip. 

 In Dorsey, the Court concluded that:

 The State relied upon the hearsay statements of co-workers and friends to
weave a story of abuse and fear. Critical in the plot were the hearsay
statements described herein. Not only was the inadmissible hearsay
evidence extremely prejudicial, given the State's theory of the case, it also
tended to negate the defensive theory offered by appellant and to cause the
jury to convict on the basis of inadmissible evidence. 


24 S.W.3d at 930. Similarly, the State's circumstantial evidence was enhanced by the
inadmissible hearsay statements of the deceased that appellant caused her black eye and
busted lip, indicating to the jury that appellant, not the deceased, was the aggressor in the
relationship. Concluding that the erroneously admitted evidence had a substantial and
injurious effect on the verdict of murder, issues three and four are sustained. 

 Our sustention of issues three and four requires that the judgment be reversed and
the cause remanded. Thus, consideration of appellant's remaining issues is pretermitted. 
Tex. R. App. P. 47.1. Accordingly, the judgment of the trial court is reversed and the cause 
remanded for a new trial. 

 Don H. Reavis

 Justice



Do not publish. 

 
1. A mistrial was granted upon the first trial because the jury was unable to reach a
verdict. The offense of deadly conduct was submitted in the charge during the second trial
but it was not submitted in the charge at the first trial. 
2. A copy of appellant's statement is attached as appendix "A."
3. In Dorsey, the court held that (1) statements by the deceased that if anything
happened to her, it "meant that Dorsey had killed her . . .," and (2) statements by the
deceased that Dorsey had once held her down on the bed with a knife to her throat, etc.
were not reflective of the victim's state of mind but simply recounts her memory of events.