

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00036-CR

BYRON O'KEITH BARRETT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 24865

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

When the body of Donna Barrett (Donna) was found on her living room floor in a pool of her own blood, it bore thirty-two stab and cut wounds, including wounds to the throat. Donna's husband, Byron O'Keith Barrett (Barrett), was ultimately convicted of her murder and sentenced to life in prison. At Barrett's trial, substantial circumstantial evidence supported the jury's finding of Barrett's guilt in Donna's murder. The following listing of a few events in the record provides context of the crime:

| Thursday, April 26, 2012: | |
|---|---|
| | Donna bonds Barrett out of jail. He had been held on an indictment for the aggravated assault charge stemming from Donna's December 28, 2011, statement complained of herein. |
| **Friday, April 27, 2012:** | |
| 2:30–3 a.m. | A surveillance video camera records Barrett on the premises of a local convenience store with two female friends, Gwen Mason and Anise Thomas, with whom he reportedly used drugs. Barrett is wearing clothes matching those later found in the trunk of Donna's car. |
| 7 p.m. | Allie Burris, another female friend of Barrett's with whom he had a child—and with whom he reportedly used drugs—sees Barrett for the final time that evening. |
| 8:30 p.m. | Donna sends Barrett a final text message from her cell phone, the last recorded communication in an argumentative exchange of texts with him that evening. |
| 9–10:30 p.m. | Barrett arrives at and leaves Billy Clement's house in Donna's car. |
| **Saturday, April 28, 2012:** | |
| 1–2 a.m. | Barrett appears at Anise's apartment. |
| 3–4 a.m. | Barrett appears at Billy's house on foot. |
| 6:30 a.m. | Donna is expected at work, but fails to appear. |
| 7:30 p.m. | Donna's car is found parked in the parking lot of Gwen's and Anise's apartment complex, near Allie's apartment. Testimony suggests that Barrett parked it there late Friday night or early Saturday morning. In the trunk, there were two trash bags with bloody clothes matching those Barrett had worn when recorded by the surveillance camera early Friday morning. Donna's blood later was matched to the blood on the clothing. Blood was also found on the driver's side floor of the |

| | car and on a pair of boxer shorts in the trunk, but neither of those were DNA tested. Donna's cell phone was also found in her car and bore Barrett's fingerprint as the most recent (on top) print. Barrett's fingerprint was also the most recent (on top) print on the driver's side, inside door handle of Donna's car. |
|---|---|
| 9:20 p.m. | Donna's body is found in her house. |
| 11 p.m. | An officer first interviews Barrett. |

During Barrett's trial, Donna's written statement describing Barrett's assault of Donna, occurring approximately four months before her death, was admitted into evidence over his hearsay objection. On appeal, Barrett claims that admitting that statement was harmful error. Although (1) Donna's statement was objectionable hearsay, (2) admitting the statement was harmless error. We, therefore, affirm the trial court's judgment.

*(1) Donna's Statement Was Objectionable Hearsay*

We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard, and we will not disturb the trial court's ruling if it is within the zone of reasonable disagreement. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Smith v. State*, 401 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd).

On the third and final day of its case-in-chief, the State presented a written statement from Donna, made December 28, 2011,[1] some four months before her death. The statement described the couple arguing about Barrett's involvement with another woman, Allie Burris.[2] Donna said Barrett "snapped" and held her down on the bed, ripped off the shirt she was

---

[1]The statement was actually written by Paris, Texas, police officer Jeremy Derkson. Derkson testified that Donna narrated the contents of the statement to him, he wrote the statement, and Donna signed it at a Paris hospital that night.

[2]The statement refers to "Allie Brewer (sic)," but Allie Burris testified at trial, and Ali Burris was mentioned in other testimony as having a child by Barrett. Nothing suggests that these references point to more than one person.

3

wearing, and slung it at her, hitting her in the left eye. Barrett then went to the kitchen and retrieved a knife, the blade of which Donna estimated was about twelve inches long, held the knife to Donna's throat, and said he should just kill her. "[Barrett] began saying he could just stab me and different things he could do with the knife." At this point, according to her statement, Donna begged for her life. Barrett dragged her from the bed to the living room, at which point he accused Donna of seeing another man in Dallas. When Donna denied this, Barrett "snapped again" and grabbed her neck with his hands and choked her until her "air was cut off and [she] almost blacked out." He accused Donna of having cameras in the house, said if he could not have her, no one would, and threw her cell phone to the ground, breaking it, so she could not call the police. He threatened to kill her if she tried to leave. He spent the rest of the day with the knife close by and not "let[ting] [Donna] out of his sight." He left later that evening, and Donna went to the emergency room.

At trial, Barrett objected to the admission of the statement because it contained extraneous offenses and hearsay; on appeal, he complains only of hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). The State offered Donna's statement to provide background on the relationship between Barrett and Donna, to demonstrate Barrett's history of violence against Donna, and to point out a similarity between the aggravated assault in December with the manner of Donna's April murder, which included multiple stab wounds and evidence of choking. Donna's statement was hearsay; it was offered

4

by the State to prove that four months before her murder, Barrett attacked her, choked her, threatened her with a knife, and dragged her from the bedroom to the living room.[3]

The State argues Donna's written statement was properly admitted under Article 38.36(a) of the Texas Code of Criminal Procedure:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005). While the statement qualifies for admission under Article 38.36(a), evidence offered under this statute must also comply with the Texas Rules of Evidence. *See Garcia v. State*, 201 S.W.3d 695, 702–03 (Tex. Crim. App. 2006); *Smith v. State*, 5 S.W.3d 673, 677–78 (Tex. Crim. App. 1999); *see also Wilbert v. State*, No. 06-00-00049-CR, 2001 Tex. App. LEXIS 420, at *13 (Tex. App.—Texarkana Jan. 23, 2001, no pet.) (not designated for publication) ("Article 38.36 does not trump the rules of evidence . . . .").

The State suggests that portions of Donna's written statement qualify for admission under Rule 803(3) of the Texas Rules of Evidence. Hearsay statements may be admissible if the statement shows the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as . . . mental feeling, pain, or bodily health)." TEX. R. EVID. 803(3).

The State points to portions of Donna's statements where she stated that Barrett said, "I should just kill you;" that he told her "if [you] try to leave [I will] kill [you];" and that she packed a bag of clothes and would not return home. Although not pointed to by the State, we

---

[3]Crime scene evidence showed Donna had been choked, stabbed in her bed, then dragged to the living room.

5

also take note of Donna's statement that she "begged [Barrett] for [her] life." However, all of these statements are recitations of events that occurred before the making of the statement. In contrast, in *Garcia v. State*, 246 S.W.3d 121 (Tex. App.—San Antonio 2007, pet. ref'd), the admitted statements were made by witnesses describing the victim's demeanor and statements as observed by the witnesses. For example, the testifying witnesses said that the victim "expressed fear of her husband" "several times," and that the victim "was petrified. She was really, really scared," "was nervous and upset," and had to be convinced to come to dinner with one of the witnesses, where the victim feared she would put the witness at risk. *Id.* at 131–32. Donna's statements, though, indicate her fear of Barrett only through inference, which is not sufficient to warrant admission under Rule 803(3). *See Barnum v. State*, 7 S.W.3d 782, 790–91 (Tex. App.—Amarillo 1999, pet. ref'd) (victim's statements were out-of-court statements describing events and her belief defendant may contemplate killing her; these demonstrated fear only through inference; not admissible under 803(3)).

The State also points to Donna's statement that she "went to a friend's house who convinced [her] to come to the ER." As with the portions discussed above, this is a description of Donna's past action. This statement does not, as the State argues, evince a present sense impression of pain. The statement does not indicate Donna went to the hospital because she was in pain; it is true that, in an earlier section of the written statement, Donna related that, during Barrett's assault of her, he choked her, cutting off her air supply, and that she "almost blacked out." But none of that amounted to a statement that she was currently in pain at the time of the

6

statement;[4] nor will we read the rest of the inadmissible portion of the statement to lend context to Donna's statement she would not return to the house and infer a present emotion of fear. We contrast this situation with that in *Dorsey v. State*, 24 S.W.3d 921 (Tex. App.—Beaumont 2000, no pet.). There, the victim's statement that she was thinking of leaving her husband and asked for the name of a divorce lawyer was admissible under Rule 803(3) to show the victim's intent to leave the defendant. *Id.* at 928. In the case before us, Donna's statement that she would not return home, on its own, does not evince a present sense of emotion or of fear: it has to be read in the context of the rest of the inadmissible statement. The statement in *Dorsey* was sufficient, on its own, to support the proffered intent of the declarant.[5]

Alternatively, the State suggests Donna's statement was admissible under Rule 804(b)(3)(A)–(B), which allows admission, when the declarant is unavailable, of

> A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history even though declarant had no means of acquiring personal knowledge of the matter stated; or

> A statement concerning the foregoing matters, and death also, of another person, if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared.

TEX. R. EVID. 804(b)(3)(A)–(B). The State points to Donna's statement describing her confrontation with Barrett about his infidelities with another woman and claims this amounts to a

---

[4]We also take note that Officer Derkson, who interviewed Donna and took her December statement, offered no testimony suggesting she was in pain at the time of her interview. Derkson described visible injuries, but to the extent this testimony equates to a then-existing physical condition, Derkson's testimony stood on its own.

[5]*Dorsey* went on to find several other statements inadmissible, which evinced the declarant's belief or were recitations of the declarant's memory of events. *Dorsey*, 24 S.W.3d at 928–29.

statement about Donna's marriage to Barrett. We find no mention of the marital relationship in Donna's statement. Parties do not need to be married in order to "cheat" on one another. The challenged statement is not admissible under Rule 804(b) (3). It was error to admit Donna's statement.

*(2)    Admitting the Statement Was Harmless Error*

Improper admission of hearsay evidence is nonconstitutional error. *Garcia v. State*, 126 S.W.3d 921, 927–28 (Tex. Crim. App. 2004). We must disregard the error unless it substantially affected Barrett's rights. TEX. R. APP. P. 44.2(b).[6] Our harm analysis considers

> everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case . . . the State's theory and any defensive theories, closing arguments, . . . and whether the State emphasized the error.

*Rich v. State*, 160 S.W.3d 575, 577–78 (Tex. Crim. App. 2005). There was substantial evidence of Barrett's guilt, exclusive of Donna's written statement. Also, many of the facts mentioned in Donna's statement were properly in the record through other testimony.

A significant factor establishing Barrett's guilt, in addition to the physical evidence, was the fact that Barrett gave officers at least three materially different accounts of his whereabouts Friday evening. Initially, Barrett claimed he last had contact with Donna late Thursday night, April 28, leaving the house about 1:15 a.m. Friday. He said that, on Friday, he saw Donna driving, but did not speak to her. He admitted to having communicated with Donna only by telephone Friday, arguing over her intent to withdraw as surety on his bail bond. Some weeks

---

[6]"Any other [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b).

later, his narrative changed. During a subsequent interview with law enforcement,[7] Barrett was told that law enforcement could monitor Barrett's location by tracking his cell phone.[8] At that time, Barrett admitted that he had returned to the house Friday evening; Barrett claimed that he and Donna argued briefly at the house and that Barrett left after only a few minutes. Later during the same interview that produced Barrett's admission that he had been at the house Friday evening, his narrative changed again. Barrett admitted then that, when he returned to the house Friday night, he saw Donna's body on the living room floor, and he fled. He denied kneeling by the body or getting close enough for her blood to contact him. He also stated that he spent the rest of Friday night and most of Saturday drinking, doing drugs, and having sex with two or three other women.

Barrett also claimed that, when he was at the house Friday night, Donna's car was not there, and he unsuccessfully looked for it. Inconsistent with that was the testimony by Barrett's friend, Billy Clement, that he saw Barrett in a blue car between 9:00 and 10:30 Friday night. When shown a picture of Donna's blue car, Clement identified it as the one in which he had seen Barrett. The car was found Saturday night, after Donna's body was found, near some apartments by Paris Junior College. Two of Barrett's friends, with whom he frequently smoked crack cocaine, lived in those apartments. The testimony of those women was inconsistent and difficult

---

[7]Barrett initiated this discussion with Detective Derek Belcher because Barrett was concerned about receiving his worker's compensation checks while incarcerated. Belcher said the first fifteen minutes of his conversation with Barrett involved the checks and Barrett's concerns that a friend might be taking them and that Barrett asked no questions about Donna. Eventually, the conversation turned to the circumstances around Donna's murder.

[8]Belcher testified this was not possible—at best it might be possible to locate a person in half of Paris, given the state of cellular communication technology in that area. Barrett does not raise this as a point of error, and law enforcement has significant leeway in representing the status of its investigation when questioning suspects. *See Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969); *Oursbourn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008).

to follow, possibly owing to their drug consumption; but there are suggestions in their testimony that Barrett arrived at the apartments late Friday night or early Saturday morning. Additionally, one of the women, Gwen, suggested she had been told by Anise, the other woman, that Barrett had parked Donna's car in the parking lot Friday night or Saturday morning.[9] A third friend,

---

[9]In addition to her drug-impeded memory, Gwen does not appear to have been eager to testify for the State. Her testimony was secured by subpoena; and she seemed unwilling to acknowledge a statement she may have made to police during their investigation:

> Q.      [By the State]  You agree with me that Anise told you that [Barrett] --
>
> [By Defense Counsel]:   Your Honor, I'm going to object, this is hearsay.
>
> THE COURT:  Sustained.
>
> [By the State]:  I'll withdraw that.
> Judge, I'm going to -- this is going to be for the impeachment purposes of Anise's statement.
>
> THE COURT:  Okay.
>
> Q.      [By the State]  Did Anise talk to you about [Barrett] driving Donna's car?
>
> A.      [By Mason]  No.
>
> Q.      You told Detective Belcher that she did, though, correct?
>
> A.      No, I looked at that --
>
> Q.      Well, you listened to it on tape, and that's exactly what you told him on the tape.
>
> [By Defense Counsel]:   Your Honor, I'm going to object to counsel arguing with the witness.
>
> [By the State]:  I darn sure am, Judge.
>
> THE COURT:  Overruled.
>
> Q.      [By the State]  Did you listen to the audio tape of your interview with Detective Belcher?
>
> A.      [By Mason]  Yes.

10

Allie, lived very close to the apartments. Allie testified that she and Barrett frequently smoked crack cocaine and that she had not seen Barrett since about 7:00 p.m. Friday.[10]

In addition to the relative strength of the evidence of Barrett's guilt, several pieces of evidence confirmed at least some of the allegations in Donna's statement. Barrett agreed he had been arrested for aggravated assault arising out of the December incident, though he denied

---

Q.      On the audiotape did you tell Detective Belcher that Anise told to you that the defendant had parked Donna's car in a parking lot? Did you tell Detective Belcher that?

A.      I don't remember that.

Q.      What you told us is, yeah, I told --

A.      I said --

Q.      -- Detective Belcher that but it's not true.

A.      No, I said that -- on the tape I said that I heard that the car was on the parking lot.

Q.      From Anise?

A.      From Anise's house.

Q.      That's all I'm asking.

A.      Okay.

Q.      Anise told you the defendant parked his wife's car, on Friday night/Saturday morning, in a parking lot?

A.      On the parking lot.

Q.      Okay. That's all I'm asking, ma'am.

A.      Okay.

          [By the State]: I'll pass the witness.

          [Mason]: My God.

[10]Evidence was introduced that Donna and Barrett were arguing via text messages until about 8:30 p.m. Friday. That was the last message on Donna's phone.

11

having choked Donna or threatened her with a knife; he said he only slung a shirt and hit her in the eye. In fact, the evidence was that Donna had just the day before her death bonded Barrett out of jail on the assault charge arising from the December incident. He acknowledged a protective order had been issued after the event. Officer Derkson, who took Donna's statement, described her face as swollen and bruised, and described bruising on her neck, consistent with being struck near the eye and having been choked. Donna's brother, Charles Miles, testified, without objection, that he had previously visited Donna in the hospital after various instances of physical altercations between Donna and Barrett: "Like, he hit her one, two -- three -- three times, you know, domestic violence, he had beat her up. I went to the hospital a couple of times where he had jumped on her and beat her up pretty bad." Miles had been summoned by family members Saturday when they could not contact Donna. Miles eventually broke into the house and discovered his sister's body.

We also must consider the State's closing argument and any emphasis placed on the inadmissible statement. The State's closing argument took up about fourteen pages of the reporter's record.[11] About one page of rebuttal addressed Donna's December statement, which the State characterized as "the victim foreshadow[ing] her death; she has a voice here today to tell you how she's going to be killed." The State then read from or summarized the statement and pointed out similarities between that statement's description of Barrett choking Donna with the medical examiner's testimony that suggested she had been choked during the murder. From

---

[11]The State's initial closing argument was about six pages, and its rebuttal was about eight pages.

12

there, though, the State's argument invited the jury to imagine the events of the murder itself, established by the evidence of the instant offense.

Reviewing the totality of the record, including the State's reference to Donna's statement, we are confident Barrett's rights were not substantially affected by the improper admission of this evidence. Given the otherwise strong evidence establishing Barrett's guilt, the fact that much of the statement's contents were in evidence otherwise, and the relatively limited reference to the statement, we conclude that the statement's admission was harmless.

We overrule Barrett's point of error and affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     January 10, 2014
Date Decided:       February 27, 2014

Do Not Publish

13