NO. 12-10-00027-CR

            

IN THE COURT OF APPEALS 

 

            TWELFTH
COURT OF APPEALS DISTRICT

 

                                      TYLER,
TEXAS

JASON THAD PAYNE,                                    §                 APPEAL
FROM THE 402ND

APPELLANT

 

V.                                                                         §                 JUDICIAL
DISTRICT COURT OF

 

THE STATE OF TEXAS,

APPELLEE                                                        §                 WOOD
COUNTY, TEXAS                                                                            








MEMORANDUM
OPINION

            Jason
Thad Payne appeals his conviction for murder.  In five issues, Appellant argues
that the evidence is insufficient to support the verdict, that the trial court
erred in allowing certain testimony, and that State was obligated to correct
erroneous testimony.  We affirm.

 

Background

On
December 11, 2007, Appellant called 911 from his house and told the operator
that “his wife and his son are both shot” and that he needed help.  Officers
responded and found Appellant’s wife, Nichole, dead in her bedroom.  She had
been shot in the head, and her body was still warm when the police arrived.  The
police found Austin Taylor Wages, Nichole’s teenaged son,[1] lying on his bed
with a fatal gunshot wound to his head.  His body was found in what was
described as a sort of a garage apartment that was his bedroom.  His body was
cold to the touch.  He had a rifle between his legs, and it appeared that he
might have shot himself. 

Appellant
told the police that he did not shoot Nichole or Austin.  He told the
investigators that he left the house that morning and dropped his five year old
son off at school at around 8 a.m.  He told the investigators that he and his
two year old daughter returned home, but turned around to go back to town to
take her to the park.  He said that they did not go to the park, but went back
to the house to tell Nichole their plans.  However, upon returning, instead of
going into the house, he and his daughter went to throw acorns into a creek on
the property.  Appellant said that after stopping to check on some birds that
were part of a family business, he went into the house and discovered Nichole
and Austin.  His call to 911 was made at 9:09 a.m.

Appellant
told investigators that he and Nichole did not have marital problems and that
the family did not have financial problems.  Noel Martin, a crime scene
investigator with the Smith County Sheriff’s Office, conducted an investigation
during which he reached the conclusion that Austin shot himself.  The rifle
found with Austin’s body was used to shoot both him and Nichole.  Subsequent
investigation and laboratory work led the investigators to the conclusion that Austin
could not have shot himself.  

In
December 2008, a Wood County grand jury indicted Appellant for the offense of
capital murder, alleging that Appellant shot and killed Nichole and Austin. 
The State did not seek the death penalty, and Appellant pleaded not guilty.  According
to the evidence at trial, the investigators concluded that Austin could not
have shot himself based on an assessment of the entire scene of the shootings,
and the physical geometry of the gun and the distance between the end of the
rifle and Austin’s body at the time the rifle was fired.   

A
trial was held, and the jury found Appellant guilty as charged.  He was
sentenced to life imprisonment.  This appeal followed. 

 

Sufficiency of the Evidence

            In
his first and second issues, Appellant argues that the evidence is legally and
factually insufficient to support the jury’s verdict.

Standard
of Review

Prior
to 2010, Texas appellate courts reviewed both the legal and factual sufficiency
of the evidence to support a verdict in a criminal case.  Legal sufficiency
review is defined by Jackson v. Virginia, 443 U.S. 307, 315-16,
99 S. Ct. 2781, 2786-87, 61 L. Ed. 2d 560 (1979).  Factual sufficiency review
is defined by Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim.
App. 1996).  In October 2010, the court of criminal appeals held that there is “no
meaningful distinction between the Jackson v. Virginia legal
sufficiency standard and the Clewis factual sufficiency standard”
and overruled Clewis and its progeny.  See Brooks v. State,
323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality opinion).  The court held
that “the Jackson v. Virginia standard is the only standard that
a reviewing court should apply in determining whether the evidence is sufficient
to support each element of a criminal offense that the State is required to
prove beyond a reasonable doubt.”   See id.  Accordingly,
we will consider Appellant’s arguments that the evidence is legally and
factually insufficient together under the Jackson v. Virginia standard
of review. 

When
reviewing the sufficiency of the evidence, we view all of the evidence in the
light most favorable to the verdict to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  See Jackson, 443 U.S. at 315-16, 99 S. Ct. at 2786-87; Brooks
v. State, 323 S.W.3d at 899.  Under this standard, a reviewing court
does not sit as a thirteenth juror and may not substitute its judgment for that
of the fact finder by reevaluating the weight and credibility of the evidence.  See
Brooks, 323 S.W.3d at 899; Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999).  Instead, a reviewing court defers to
the fact finder’s resolution of conflicting evidence unless that resolution is
not rational in light of the burden of proof.  See Brooks,
323 S.W.3d at 899–900.  The duty of a reviewing court is to ensure that the
evidence presented actually supports a conclusion that the defendant committed
the crime.  See Williams v. State, 235 S.W.3d 742, 750 (Tex.
Crim. App. 2007).

The
sufficiency of the evidence is measured against the offense as defined by a
hypothetically correct jury charge.  See Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997).  Such a charge would include one that “accurately
sets out the law, is authorized by the indictment, does not unnecessarily
increase the State=s
burden of proof or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant is
tried.”  Id.  

In
this case, to support Appellant’s conviction for capital murder, the State’s evidence
had to show that Appellant intentionally or knowingly caused the deaths of Nichole
and Austin during the same criminal transaction.  See Tex. Penal Code Ann. § 19.03(7)(A) (Vernon
Supp. 2010).

Analysis

As
in almost every criminal case, there is direct evidence that supports the
verdict in this case and there is circumstantial evidence that supports the
verdict.  The circumstantial evidence in this case, as we will discuss, is not
very helpful in resolving the case or in evaluating the jury’s verdict.[2]  And the
conclusions to be drawn from the direct evidence are subject to considerable
disagreement.  

With
two people shot to death in their beds, there was a great deal of physical
evidence for investigators to gather and for experts to evaluate.  Both sides called
experts to explain to the jury the conclusions that could be drawn from the stippling–a
pattern of dots or tattoos left on skin or other surfaces that are close to a
discharging firearm–and soot found on Austin, from the patterns and pooling of
blood from his wounds, and from the simple geometry of how his body was
positioned both before and after he was shot.  The trial became a contest
between two narratives.  In the State’s version, Appellant shot Austin, either
before he took his son to school or after he returned to the home, and then
shot Nichole.  He staged the scene in Austin’s room to look like a suicide and
then called the police.  In Appellant’s version of events, Austin shot his
mother and then shot himself.  

There
were several problems with Appellant’s version of events.  First, Austin did
not have any of his mother’s blood on his person.  The State’s expert testified
that he would expect to see some of Nichole’s blood on Austin if he had shot her
because the shooter would have been reasonably close to Nichole and some
biological material would have, by a principle called “blow back,” been placed
on the shooter.[3] 
Additionally, the experts were in rough agreement that the rifle used to shoot Austin
was at least six inches from his face when the shot was fired.  Appellant’s
expert testified that the distance was between four and ten inches; the State’s
expert testified that it was within two inches of twelve inches.  Because the
rifle had a safety mechanism that would have had to have been employed to allow
it to discharge, Austin would not have been able to shoot the rifle with his
hand unless the distance between the end of the barrel and his face was about six
inches or less.  Appellant’s expert testified that Austin could have shot the
rifle with the end of the barrel ten inches from his face if he used his feet
to prop it up against the floor and operated the safety and trigger with his
toes.  

Also,
it was important to the State’s expert that there was no “blow back” of Austin’s
biological material on the floor in front of his body, something he would have
expected if Austin had shot himself while in a seated position.  In addition,
the rifle was resting in Austin’s lap, and the State’s expert thought that it
would have moved from that position away from the body if Austin had managed to
shoot himself.  Finally, there was blood on the palm of Austin’s hand, which
was facing upwards.  The State’s expert testified that based on where the blood
flowed from Austin’s wound, blood would not have reached the top of his hand. 
Therefore, he concluded that the body had been moved after the shooting.  

As
to the circumstantial evidence, investigators found what appeared to be a small
amount of blood on Appellant’s truck and found a wash cloth in his truck that
had what was described as fresh blood on it.  The blood on the wash cloth was Nichole’s
blood.  The investigators also found what one witness termed as graves–two
large holes in the ground–on the property.  Finally, there was evidence of
marital discord and that Appellant and his family faced financial distress. 
Also, Appellant had bought life insurance on his wife and stepson several months
before the shooting

The
bloody rag would appear to be a substantial piece of evidence, although, as
Appellant points out, the photograph admitted into evidence depicting it does
not show a bright red coloration, which is how it was described by witnesses.  While
obtaining the proceeds of the life insurance policy could have been a motive,
the evidence does not support the conclusion that it was part of a longstanding
plan to kill Nichole and Austin.  The life insurance was purchased at a time of
significant financial change in Appellant’s and Nichole’s life because he had
just received proceeds of a lawsuit in an amount of more than $300,000.  The
rider for the child was for, essentially, burial expenses, and there was
evidence that Appellant could have elected to purchase a policy with a higher
benefit for little additional money.  

As
to financial stresses within the family, some of the State’s evidence about
financial stress included Nichole’s depression as a result of financial
troubles.  However, her depression had been diagnosed at a time prior to the
settlement of the lawsuit.  The lawsuit was settled more than six months before
the shooting.  Furthermore, while the State was able to show that the family’s
bank account was overdrawn at the time of the shooting, Appellant had purchased
several vehicles and a home for cash from the proceeds of the lawsuit.  Also, the
family had some income from a small business.  In short, the evidence would
support the conclusion that Appellant had spent the settlement and was out of
money.  However, it would also allow the conclusion that the family’s financial
problem was one of cash flow, and that the things that are monthly obligations
for so many families–a mortgage and a car payment–were not an issue for this
family.  

With
respect to emotional stress within the family, several witnesses testified that
there were problems between Nichole and Appellant.  Nichole’s ex-husband
testified that she sent him postcards asking for money.  Her father testified
that Appellant did not want her to have contact with him.  Nichole’s sister-in-law
testified that Nichole had wanted a divorce and that she had said that Appellant
had threatened to kill her.  In addition, the State asserts that it is significant
that Appellant denied to the investigators that the family had marital or
financial issues.  

Finally,
Appellant’s timeline of events is not inconsistent with the verdict.  According
to what he told the police, he arrived home sometime around 8:15 a.m., but did
not call the police until after 9 a.m.  He had an explanation for this–he was throwing
acorns in the yard with his toddler–but it is not an alibi that is supported by
evidence other than his statement.

            After
careful review of the evidence, and in a light most favorable to the verdict,
we conclude that what we have termed circumstantial evidence is not sufficient,
standing alone, to support the verdict.  The blood on the rag is not bright
red, many married couples have life insurance, the evidence is inconclusive as
to whether the family was in any financial distress, and Appellant’s denial of
marital issues is neither surprising nor as unequivocal as the State suggests
it was.  Likewise, the holes in the ground on the family property, while a
mystery, do little to suggest that Appellant killed his wife and her son.  Finally,
one of Appellant’s witnesses testified that Nichole did not arise until 10 or
11 a.m., and that Appellant often engaged in outdoor activities after dropping
his son off at school.

            The
question then is whether the jury could have concluded that the forensic evidence
showed that Austin did not shoot himself.  After careful review of the
evidence, we hold that a rational jury could have concluded that the evidence
showed beyond a reasonable doubt that Austin did not shoot himself.  There are
three parts of the physical evidence that lead us to this conclusion.  First,
the theory posited by Appellant is implausible.  Austin would have had to point
the rifle at his face while maintaining a distance of at least four inches from
the end of the barrel to his face.  He would then have had to engage the safety
and fire the rifle, all while looking down the barrel.  The expert testimony
was that most suicides involving gunshot wounds occur with the end of the
barrel touching or very close to the body.  Also, the expert testimony was that
it was very rare, if ever, that a person committed suicide while looking at the
opening of the barrel of a firearm.  

            Just
because Appellant’s version of events is implausible does not mean the State’s
burden of proof is satisfied.  However, the combination of the State’s expert’s
forensic conclusions about the positioning of Austin’s body is compelling. 
There was pooled blood on the uppermost portion of his hand, where it would not
have had occasion to collect if Austin’s body had not been moved.  Additionally,
the lack of biological material on the floor allows the conclusion that he was
not shot while in a sitting position, which was necessary to Appellant’s
construction of the shooting.  Third, the jury could have credited the
conclusions of the State’s expert witness that the barrel was at least ten
inches from Austin’s head when the shot was fired.  This would have allowed the
conclusion that it was essentially impossible for Austin to have shot himself. 


Taking
this forensic evidence together, and viewing it in a light favorable to the
verdict, we hold that a rational jury could have concluded that Austin did not
take his own life.  That determination flows fairly directly to the conclusion
that Appellant is the person who shot Nichole and Austin.  There were other
possibilities: Austin could have shot Nichole and Appellant shot Austin, or an
unknown third party could have shot Austin or Nichole.  But once the jury
concluded that Austin did not shoot himself, the conclusion that Appellant shot
them both is reasonable.

There
is significant evidence contrary to the verdict.  Appellant did not have any
biological material on his person or clothing, and he did not have gunshot
residue on his hands.  He did not flee, and he did not confess.  Nevertheless,
the jury’s conclusion that Austin did not shoot himself is supported by the
evidence, and we hold that a rational jury could have concluded beyond a
reasonable doubt that Appellant shot Nichole and Austin and that he was guilty
of capital murder.  We overrule Appellant’s first and second issues.

 

Admission of Evidence

            In
his third issue and fourth issues, Appellant argues that the trial court erred
in allowing the State to offer into evidence certain statements made by Nichole
Payne.   

Background

            Appellant’s
arguments center on statements made by Nichole to two witnesses that were
admitted at trial.  Specifically, Richard Hawthorne, Nichole’s father, testified
that Nichole had told him that Appellant did not want her to have any contact
with her parents.  Sarah Hawthorne, Nichole’s sister-in-law, testified that
Nichole told her the night before her death that she wanted a divorce and that Appellant
had threatened to kill her.  She also said that Nichole had made similar
statements several months earlier.  Finally, she testified that Nichole told
her that Appellant had threatened to burn her alive in the house and had begged
her to “avenge” her if anything happened to her.  Appellant objected to all of
the statements on the grounds that they were inadmissible hearsay.[4]   

Standard
of Review and Applicable Law

Generally,
we review a trial court’s ruling to admit or exclude evidence under an abuse of
discretion standard.  See Robbins v. State, 88 S.W.3d 256,
260 (Tex. Crim. App. 2002) (citing Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990)).  A trial court abuses its discretion
if its decision falls outside of the “zone of reasonable disagreement.”  Montgomery,
810 S.W.2d at 391.  In conducting this review, we defer to the trial judge’s
assessment of the weight and credibility of the evidence and view the evidence
in the light most favorable to the trial court’s decision.  See Kelly v.
State, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992).

“Hearsay”
is an out of court statement “offered in evidence to prove the truth of the
matter asserted.”  Tex. R. Evid. 801(d). 
Hearsay is inadmissible.  Tex. R. Evid.
802.  However, statements that are an expression of a then existing mental, emotional,
or physical condition including an existing state of mind or emotion are an
exception to the hearsay rule and are admissible.  See Tex. R. Evid. 803(3).  Additionally,
although the statute must be read in harmony with other evidentiary provisions,
Texas law allows the State to offer “testimony as to all relevant facts and circumstances
surrounding the killing and the previous relationship existing between the
accused and the deceased, together with all relevant facts and circumstances
going to show the condition of the mind of the accused at the time of the
offense.”  Tex. Code Crim. Proc. Ann. art.
38.36 (Vernon 2003); Garcia v. State, 201 S.W.3d 695, 702 (Tex.
Crim. App. 2006); Smith v. State, 5 S.W.3d 673, 678–79 (Tex.
Crim. App. 1999) (evidence admissible under Article 38.36(a) may still be
excluded under the rule of evidence).  

Analysis

Several
of the statements offered by the State were clearly expressions of Nichole’s
beliefs at the time they were expressed.  Her statement that her husband did
not want her to have contact with her parents and that she wished to divorce Appellant
were expressions of her state of mind at the time they were made and were
admissible as an exception to the hearsay rule.  See Martinez v. State,
17 S.W.3d 677, 689 (Tex. Crim. App. 2000).  Appellant did not object on the
basis that these statements were not relevant, and the trial court’s decision
to admit those statements is not an abuse of discretion. 

Some
of the statements went beyond simple expressions of Nichole’s state of mind. 
For example, the statement that Appellant had threatened to kill her was not an
expression of Nichole’s state of mind.  It explains the reasons for her state
of mind, but Rule 803(3) permits only the expression of the state of mind and specifically
does not include “a statement of memory or belief to prove the fact remembered
or believed.”  See Tex. R. Evid.
803(3); Dorsey v. State, 24 S.W.3d 921, 929 (Tex. App.–Beaumont
2000, no pet.); Barnum v. State, 7 S.W.3d 782, 790 (Tex. App.–Amarillo
1999, pet. ref’d); Cathy Cochran, Texas
Rules of Evidence Handbook, 825–26 n.362 (5th ed. 2003).  Also, her
statement begging her sister-in-law to avenge her death was not a statement of
her state of mind but a supposition that her husband would be responsible if
she were to be killed.  That kind of statement does not fit into the state of
mind exception to the hearsay rule.  See Dorsey, 24 S.W.3d at 929
(citing Barnum, 7 S.W.3d at 790 and Vann v. State,
853 S.W.3d 243, 250 (Tex. App.–Corpus Christi 1993, pet. ref’d)). 

The
State argues that Nichole’s request that her sister-in-law avenge her death is
admissible and cites Martinez, 17 S.W.3d at 688, in support of
its argument.  In Martinez, the court held that the victim’s
statement that she was afraid of the defendant was admissible as a present
sense impression as was her plea to her landlord to call the sheriff if the
defendant was spotted.  Id. at 689.  We have held that Nichole’s
statements that she was afraid of Appellant were admissible, which is
consistent with the Martinez decision.  The victim’s statement in
that case to call the police was not, as the court noted, an expression of a
fact.  Id.  Instead, it was more appropriately considered to be an
expression of her fear of the defendant.  Id.  By contrast,
Nichole’s prediction that her death would need to be avenged was a guess.  If
it expressed no more than her fear of Appellant, it would fall within Martinez. 
But it cannot be said that her state of mind was that Appellant would be the
person to kill her.  That is a prediction or a conclusion drawn from her
experiences, but it was not her state of mind.  

For
the same reasons, Article 38.36 does not allow this kind of evidence to be
admitted.  As we stated earlier, Article 38.36 is no broader than the rules of evidence. 
While the fact that Nichole was fearful of Appellant may be a “fact” of their
relationship, the fact that she thought he would be her killer is not the same
kind of evidence.    

Error
in the admission of evidence is nonconstitutional error.  See Johnson v.
State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  Nonconstitutional
error that does not affect the substantial rights of the defendant must be
disregarded.  See Tex. R. App. P.
44.2(b).  Therefore, even if the trial court erred in overruling Appellant’s
hearsay objection, the error would not warrant reversal unless it had a
substantial and injurious effect or influence in determining the jury’s
verdict.  See King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App.
1997). 

We
conclude that any error in the admission of evidence in this case was
harmless.  For reasons we explained in the sufficiency of the evidence section
of this opinion, it would not be reasonable or likely for a jury to convict
Appellant solely on the circumstantial evidence consisting of the insurance
policy, the holes dug on the property, and Appellant’s animosity towards
Nichole or her family.  Indeed, if the jury concluded that it was possible that
Austin could have shot himself–that is that the scene of his death was not
staged–it would be very difficult for the jury to have reached its verdict in
light of the State’s burden of proof.  This is not to say that the admission of
harmful and incompetent evidence could not sway a jury to reach a conclusion
that is unreliable.  Indeed, in Dorsey the court of appeals
remanded the case for a new trial because of the erroneous admission of hearsay
statements including the victim’s prediction that the defendant in that case
would be the one who killed her if she died in an “unusual way.”  Dorsey,
24 S.W.3d at 929–30; see also Erazo v. State, 167 S.W.3d 889, 891
(Tex. App.–Houston [14th Dist.] 2005, no pet.) (reversing for new punishment
hearing because of improperly admitted photograph of unborn child).  

This
case is different from Dorsey in that the State’s proof in that
case relied exclusively on circumstantial evidence and the verdict rested on
inadmissible evidence.  Dorsey, 24 S.W.3d at 930.  In this case,
the only plausible conclusion about the evidence is that the jury concluded
that Austin could not have shot himself based on the physical evidence.  In
that context, the verdict rests on very substantial grounds and the admission
of Nichole’s hearsay statements had little or no effect on the verdict.  We
overrule Appellant’s third issue.

 

Confrontation Clause

            In
his fourth issue, Appellant argues that the admission of Nichole’s statement
that he did not want Nichole to talk to her family violated his right to
confront the witnesses against him.  

Applicable
Law

            The
Confrontation Clause of the Sixth Amendment provides that “in all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the
witnesses against him.”  U.S. Const.
amend. VI.  This procedural guarantee bars the admission of testimonial
statements of a witness who does not appear at trial unless the witness is
unavailable and the defendant had a prior opportunity to cross examine him.  See
Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158
L. Ed. 2d 177 (2004).  The threshold question in determining whether the trial
court erred in admitting the complained of evidence is whether the evidence is
testimonial in nature.  See Woods v. State, 152 S.W.3d 105, 113
(Tex. Crim. App. 2004).  Generally speaking, a statement is testimonial if it
is a solemn declaration made for the purpose of establishing some fact.  Crawford,
541 U.S. at 51, 124 S. Ct. at 1364.  In Crawford, the Supreme
Court held that the Confrontation Clause is “most naturally read as a reference
to the right of confrontation at common law, admitting only those exceptions
established at the time of the founding.” Id., 541 U.S. at 54,
124 S. Ct. at 1365.

Analysis

            The
trial court allowed the testimony over Appellant’s Confrontation Clause
objection on the basis that Appellant had caused Nichole to be unavailable to
testify.  This theory of admissibility is called forfeiture by wrongdoing, and
it has a long history.  See Giles v. California, 554 U.S. 353,
359, 128 S. Ct. 2678, 2683, 171 L. Ed. 2d 488 (2008) (tracing forfeiture by
wrongdoing principle to Lord Morley’s Case, 6 How. St. Tr. 769,
71 (H. L. 1666)).  

            The
problem with applying forfeiture by wrongdoing in this case, however, is that,
under the interpretation settled upon by the Supreme Court, the principle
applies only when the witness cannot be confronted because the defendant
engaged in conduct designed to prevent the witness from testifying.  Id.,
554 U.S. at 359–61, 128 S. Ct. at 2683–84.  Appellant did not kill Nichole to
keep her from testifying in his murder trial or at any other hearing or trial. 
Accordingly, he did not forfeit his right to confront her as a witness.    

            However, as the State points out, we are to
uphold the trial court’s decision on an evidentiary ruling if it is correct
under any theory, even if the trial court gave no reason or the wrong reason
for its ruling.  See Bowley v. State, 310 S.W.3d 431, 434 (Tex.
Crim. App. 2010).  Nichole’s statement that it was Appellant’s wish that she not
be in contact with her family does not violate the Confrontation Clause because
her statement is not testimonial.  The Confrontation Clause allows a defendant
to confront witnesses who “bear testimony” and that testimony cannot be
admitted unless a defendant is permitted to confront the accuser.  See Crawford,
541 U.S. at 51, 124 S. Ct. at 1364.  Testimony is typically “a solemn declaration
or affirmation for the purpose of establishing or proving some fact.”  Id. 
And the “principal evil at which the Confrontation Clause was directed was the
civil-law mode of criminal procedure, and particularly its use of ex parte
examinations as evidence against the accused.” Id., 541 U.S. at
50, 124 S. Ct. at 1354.  In Crawford, the court left “for another
day any effort to spell out a comprehensive definition of ‘testimonial,’ but
noted ‘at a minimum’ it includes ‘prior testimony at a preliminary hearing,
before a grand jury, or at a former trial; and . . . police interrogations.’”  Michigan
v. Bryant, __ U.S. __, 131 S. Ct. 1143, 1153, 179 L. Ed. 2d 93 (2011)
(quoting Crawford, 541 U.S. at 68, 124 S. Ct. at 1374).  

As the Court explains in Bryant,
there has been significant refining of the definition of “testimonial” evidence
since the Crawford decision.  In the companion cases Davis
v. Washington and Hammon v. Indiana, 547
U.S. 813, 826, 126 S. Ct. 2266, 2276, 165 L. Ed. 2d 224 (2006), the Court held
that interrogations by law enforcement officers “fall squarely within [the]
class of testimonial hearsay” when they are solely directed at establishing the
facts of a past crime.  In that case, the Court drew a distinction between
statements to police in an emergency setting given while the events were still
unfolding and a more formal investigative style interview.  The first statement
was not testimonial, in part because it was elicited to resolve the then
present emergency, and the second statement was testimonial.  Id.
537 U.S. at 829–30, 126 S. Ct. 2278–79.  

This paradigm was further refined in Bryant,
but we need not travel to the end of this road to determine that the statements
admitted here were not testimonial.  The statements were made by Nichole to her
father.  Some of the later statements, specifically the statement about
avenging her death, presuppose a later court date or at least an
investigation.  But the statements about Appellant wishing to limiting Nichole’s
contact with her family were not given in anything like a preliminary hearing
and had nothing in common with a grand jury proceeding or a police
interrogation.  Indeed, the Supreme Court has noted that “[s]tatements to
friends and neighbors about abuse and intimidation and statements to physicians
in the course of receiving treatment would be excluded, if at all, only by
hearsay rules.”  Giles, 554 U.S. at 376, 128 S. Ct. at 2692.[5]  This is so
because these statements were not made in anticipation of litigation, were not gathered
to be used in court, and were not made to be used in court.  Cf. Davis,
547 U.S. at 830, 126 S. Ct. at 2278 (deliberately recounted statements of past
criminal events to police officer are an “obvious substitute for live testimony”). 


The Confrontation Clause was not implicated
by the introduction of Nichole’s statement to her father, and the trial court
did not err in allowing its admission.  We overrule Appellant’s fourth issue.

 

Sponsoring False Testimony

In his fifth issue, Appellant argues that the State violated
his right to due process by sponsoring false testimony.  

Background

The testimony in question is that of Lieutenant Miles Tucker
who was an investigator on this case.  Tucker was asked on cross examination
about a meeting attended by him, the district attorney or his representative, and
Noel Martin, a Smith County sheriff’s deputy.  Martin is a crime scene
investigator, and he had been called in to assist with the investigation.  

Martin concluded preliminarily–some of the
forensic work had not been completed–that Austin committed suicide.  He
presented that conclusion at the meeting with Tucker.  Tucker testified that he
was not satisfied with Martin’s explanation.  He told the jury that when he
pressed Martin for detailed responses to his questions, Martin’s only response
was that he had seen these kinds of cases “many, many times.”  Martin testified
differently.  He testified that he was asked a number of questions at the
meeting and that he believed that he had “answered all of the questions that
were pertinent to this issue.”  

 

Analysis

Appellant asserts that the district attorney
was present at the meeting and that the district attorney violated his right to
due process by allowing the jury to hear Tucker’s version of events and not
correcting it.[6]  Implicit in this
assertion is that Tucker’s version of events is false.  

The law is clear that the “deliberate
deception of court and jury by the presentation of testimony known to be
perjured” violates a defendant’s right to due process.  See Mooney
v. Holohan, 294 U.S. 103, 113, 55 S. Ct. 340, 342, 79 L. Ed. 791
(1935).  A deception occurs when perjury is sponsored but also when a witness’s
testimony “gives the trier of fact a false impression” on a sufficiently
important issue.  See Ex parte Ghahremani, 332 S.W.3d 470, 477
(Tex. Crim. App. 2011).  

The problem with the application of that
standard to this case is that there is no showing that the testimony offered by
Tucker was false or that he left the trier of fact with a false impression. 
The State is correct to assert that Tucker’s testimony about the meeting is
slightly more detailed than Appellant’s description in his brief.  On the other
hand, Tucker did present the meeting as one where, in the end, Martin was
unable to answer questions put to him by anything other than a resort to his
statement that he had seen these kinds of cases “many, many times.”  If that is
not an accurate assessment of the meeting, there may be some question as to
whether the district attorney had an obligation to correct the record. 
However, as the record before us stands presently, we cannot conclude that
Tucker’s rendition of events was inaccurate.  

In his reply brief Appellant states that “[o]ne
thing is certain, the District Attorney knew at the time the testimony was
given, and knows now, whether the testimony was truthful.”  Because it does not
appear that he was present at the meeting, it is not clear at all that this is
accurate.  However, the district attorney’s personal knowledge is unimportant
because the court of criminal appeals has allowed relief when the State
unknowingly sponsors or uses false testimony.  See Ex parte Chabot,
300 S.W.3d 768, 770–71 (Tex. Crim. App. 2009).  What is important is that, as he
essentially concedes, Appellant cannot make a showing that the testimony was
false.  Instead, Appellant complains that the State successfully moved to quash
a subpoena seeking material related to the meeting and avoided a hearing on
this issue.  On the record before us, we cannot conclude that Tucker presented
false testimony, and so there is no basis on which to conclude that Appellant’s
due process rights were violated.  We overrule Appellant’s fifth issue.

 

Disposition

            Having overruled Appellant’s five issues, we affirm
the judgment of the trial court.

 

                                                                   Sam
Griffith

                                                                                             
Justice

 

 

 

Opinion delivered April 29, 2011.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(DO NOT PUBLISH)


 
 
 
 
 
 
 
  
 
 
 
 
 
  
 












[1]
The young man was called Taylor at home and Austin at school.  For ease of
reference, we will refer to him by the name Austin.





[2]
No one saw this shooting, and all of the evidence is indirect to a lesser or
greater degree.  We refer to the physical evidence and the conclusions drawn by
experts using scientific principles as direct evidence, and evidence based on
conclusions drawn from social relationships or ideas about motive or
opportunity as circumstantial evidence. 

 





[3]
There was no blow back material found on Appellant’s person or his clothing,
but there were some clothes in the dryer that investigators thought had been
recently cleaned.  





[4]
The State asserts that Appellant’s complaints were not preserved for appellate
review for lack of a specific objection.  We disagree.  In each instance,
Appellant objected on the grounds that the out of court statements were
inadmissible hearsay.  The State offered a basis for admission of the evidence,
and the trial court ruled on the objection.  Appellant did not accept the
State’s rationale for admitting the evidence, and Appellant’s objection was
reasonably sufficient to alert the trial court to his complaint.  See Tex. R. App. P. 33.1(a)(1)(A). 
Accordingly, this complaint is preserved for our review.    





[5]
Two of the Justices thought the statements at issue in Giles,
which were statements given to a police officer, were not testimonial, but the
majority concluded that argument had not been made in the lower courts.  See
Giles, 554 U.S. at 377, 378, 128 S. Ct. at 2693, 2694 (Thomas, J.,
concurring; Alito J., concurring).   





[6] The first assertion does not appear to be factually
correct.  Tucker testified that “members of the District Attorney’s Office”
were present.  Martin testified that a specific assistant district attorney,
not the district attorney, was present.